John Lemaster – AZ 011588
Maram Salaheldin – Pro Hac pending
CLARK HILL
3200 North Central Avenue, Suite 1600
Phoenix, AZ 85012
Telephone: (602) 440-4800
Facsimile: (602) 257-9582
jlemaster@clarkhill.com
msalaheldin@clarkhill.com

Attorneys for Plaintiffs Mohave County, La Paz
County, Yuma County, the City of Yuma

## THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MOHAVE COUNTY, a political subdivision of the State of Arizona; LA PAZ COUNTY, a Political subdivision of the State of Arizona, YUMA COUNTY, a political subdivision of the State of Arizona, the CITY OF YUMA, a municipal corporation,<br><br>        Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES BUREAU OF RECLAMATION; and M. CAMILLE CALIMLIM TOUTON, acting in her official capacity as the COMMISSIONER OF THE BUREAU OF RECLAMATION; and JACKLYNN L. GOULD, acting in her official capacity as the REGIONAL DIRECTOR, INTERIOR REGION 8: LOWER COLORADO BASIN, BUREAU OF RECLAMATION,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1. Plaintiffs Mohave County ("Mohave"), La Paz County ("La Paz"), Yuma County ("Yuma") and the City of Yuma (the "City") hereby sue the United States Bureau of Reclamation and M. Camille Calimlim Touton acting in her official capacity as the

Commissioner of the Bureau of Reclamation and Jacklynn L. Gould, acting in her official capacity as the Regional Director, Interior Region 8: Lower Colorado Basin Bureau of Reclamation (collectively "Reclamation") for violations of the National Environmental Policy Act ("NEPA") 42, U.S.C. §§ 4321 *et seq*. and the Administrative Procedures Act ("APA")." 5 U.S.C. § 702 *et. seq*.

2. This action concerns Reclamation's Finding of No Significant Impact, attached as Exhibit 1 (hereinafter referred to "FONSI"), based on an inadequate Final Environmental Assessment, attached as Exhibit 2 (hereinafter referred to as "Final EA"), made available on September 2, 2022.[1] Reclamation found that a transfer of fourth priority Colorado River water off the river to allow the Town of Queen Creek to use that water to support its municipal growth, when it does not even need the water, would not have a significant impact on the environment.

3. Reclamation made this finding when Arizona and the other lower basin states that rely on the river are in the midst of a 20-year megadrought that has caused the Colorado River to become the most endangered river in the United States: Lake Mead and Lake Powell are nearing dead pool; Arizona is faced with Tier 2a shortages for 2023 and likely Tier 2b or Tier 3 shortages in 2024; efforts are underway to save an additional 2 to 4 million acre-feet of water in the river system. The situation is only becoming more dire.

4. Indeed, just weeks prior to issuing the FONSI and Final EA, Reclamation reinitiated

---

[1] The Notice of Availability for Final EA, the Final EA, and the FONSI can all be found online at:
https://www.usbr.gov/lc/region/programs/ProposedAction_GSC_QC.html.

Section 7 consultation under the Endangered Species Act ("ESA") to update its 2004 Lower Colorado River Multi Species Conservation Plan, relevant excerpts of which are attached as Exhibit 3 (hereinafter referred to as "LCR MSCP").[2]

5. Reclamation now anticipates that the Colorado River will have reduced flow of 1.57 million acre-feet in the coming years not accounted for in the 2004 LCR MSCP. Yet, Reclamation relies on this 2004 LWR MSCP in the Final EA to find no significant impact.

6. Reclamation also failed to take account of the precedential nature of this transfer, the first one seeking to transfer rural mainstream water rights off the river used for agriculture to metropolitan area for municipal use.

7. The transferor of the water right, GSC Farm LLC ("GSC Farm"), and related entities own thousands of other agricultural acres along the Colorado River with appurtenant water rights that they intend to transfer. Reclamation was aware that this transfer would be used as precedence to open the floodgates of future reasonably likely transfers of water off the Colorado River, but refused to consider the impacts of these future, reasonably likely transfers.

8. While the Colorado River flows continue to diminish, and Lake Mead water elevations continue to plummet, Reclamation has set the stage for thousands of acres of farmland to be idled and tens of thousands of acre-feet of Colorado River water to be transferred off

---

[2] The LCR MSCP can be found online at:
- Volume I: http://www.riversimulator.org/Resources/USBR/MSCP/VolumeI.pdf
- Volume II: http://www.riversimulator.org/Resources/USBR/MSCP/VolumeII.pdf
- Volume III: http://www.riversimulator.org/Resources/USBR/MSCP/VolumeIII.pdf
- Volume IV: http://www.riversimulator.org/Resources/USBR/MSCP/VolumeIV.pdf

the river without any analysis whatsoever.

9. Plaintiffs seek from this Court an Order declaring that Reclamation violated NEPA and the APA and that Reclamation's actions were arbitrary and capricious, an abuse of discretion, and contrary to law and procedure required by law in issuing a FONSI and an inadequate Final EA that failed to take a hard look at the environmental impacts of the transfer.

10. Plaintiffs seek an order:

A. Enjoining Reclamation from relying on the FONSI and Final EA,

B. Directing Reclamation to prepare an Environmental Impact Statement ("EIS") or an adequate Final EA,

C. Directing Reclamation to vacate, set aside, and rescind the Final EA and FONSI, the approval of the transfer, and the contracts implementing the transfer, including:

   a. The partial assignment and transfer of Arizona fourth priority Colorado River water entitlement between GSC Farm and Queen Creek,

   b. A Colorado River water delivery contract between the United States and Queen Creek,

   c. An amendment to the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Arizona fourth priority Colorado River water entitlement,

   d. An 8.17 Wheeling Contract with Queen Creek to wheel the transferred fourth priority Arizona Colorado River water entitlement to Queen Creek through the Central Arizona Project ("CAP") system, and

D. Enjoining Reclamation from taking any action pursuant to the transfer and the contracts

implementing the transfer until Defendants have fully complied with NEPA.

## **PARTIES**

11. Plaintiff Mohave is a political subdivision of the State of Arizona. Mohave was a stakeholder and identified as one of the Agencies Consulted in the Final EA. Mohave provided comments written during Reclamation's scoping process and provided written comments on the Draft EA. True and correct copies of Mohave's comments, dated September 23, 2021 and April 14, 2022, are attached as Exhibit 4 and Exhibit 5 respectively.

12. Plaintiff La Paz is a political subdivision of the State of Arizona. La Paz was a stakeholder and identified as one of the Agencies Consulted in the Final EA. La Paz provided comments written during Reclamation's scoping process and provided written comments on the Draft EA. True and correct copies of the La Paz comments are attached as Exhibit 6, Exhibit 7, and Exhibit 8.

13. Plaintiff Yuma is a political subdivision of the State of Arizona. Yuma was a stakeholder and identified as one of the Agencies Consulted in the Final EA. Yuma provided written comments during Reclamation's scoping process. True and correct copy of Yuma's comments are attached as Exhibit 9.

14. The City is a municipal corporation. The City provided written comments during Reclamation's scoping process. True and correct copy of the City's comments are attached as Exhibit 10.

15. The Colorado River runs through and is the border of each of these Counties and the City. The river serves as a significant source of water for agriculture, domestic, municipal, and

5

industrial uses in each County and the City. The river is a recreational, scenic, and natural resource of each County and the City, as well as their citizens and visitors.

16. The Colorado River provides habitat for and supports many endangered and threatened species within each of the Counties and the City.

17. Defendant Bureau of Reclamation is an agency of the United States within the Department of Interior. Reclamation had authority for conducting and publishing the Final EA and FONSI.

18. Defendant M. Camille Calimlim Touton is the Commissioner of the Bureau of Reclamation and is sued in her official capacity.

19. Defendant Jacklynn L. Gould is Regional Director, Interior Region 8: Lower Colorado Basin Bureau of Reclamation and is sued in her official capacity.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), 1361 (mandamus against an officer of the United States), and 2201 and 2202 (declaratory judgment), and under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701- 706.

21. Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b)(2) and 1391(e)(2) because a substantial part of the events giving rise to the claim occurred, and a substantial part of property that is the subject of the actions is situated in, this judicial district.

22. There exists now between the parties hereto an actual, justiciable controversy in which Plaintiffs are entitled to have a declaration of their rights and of Reclamations' obligations, and further injunctive relief because of the facts and circumstances hereinafter set forth.

CLARKHILL\L1333\442094\269503402.v6-12/29/22

23. Plaintiffs have standing to assert their claims because they suffer tangible harm from Reclamation's violations of law as alleged herein. Plaintiffs' interest in land management and water management and the environmental consequences from the transfer of water off the Colorado River have been and will continue to be harmed by Reclamation's failure to take a hard look at the environmental consequences of its action in the Final EA and to prepare an EIS or a more detailed EA that fully analyzes the effects of this transfer. A judgment from this Court requiring Reclamation to conduct a thorough environmental review of the impacts of the project would redress Plaintiffs' harms, at least in part.

24. Plaintiffs have been accorded procedural rights under NEPA, which provides that "local agencies which are authorized to develop and enforce environmental standards may comment on the proposed federal action." 42 U.S.C. § 4332(2)(C).

25. Plaintiffs can sue to protect their own proprietary interests that might be congruent with those of their citizens.

26. Plaintiffs have a concrete interest in how lands and water are managed along the Colorado River. Transferring water off the Colorado River adversely affects both land and water use within the Counties and City.

27. In addition, Plaintiffs meet the statutory requirements for standing under the APA, 5 U.S.C. § 702, because Reclamation's issuance of the Final EA and FONSI constituted final agency action under NEPA that adversely affects Mohave, La Paz, Yuma, and the City; as a result, Plaintiffs suffer injury within the "zone of interests" of the statutory provisions they seek to enforce, here NEPA.

7

# REGULATORY BACKGROUND

## National Environmental Policy Act ("NEPA")

28. Reclamation is to prepare the EA in accordance with NEPA, the Council on Environmental Quality's ("CEQ") Regulations for Implementing the Procedural Provisions of NEPA, 40 C.F.R.1500-1508 (2005), the Department of Interior Regulations, 43 CFR 46. Reclamation received the project recommendation prior to the NEPA regulation revisions that became effective on September 14, 2020. Reclamation's analysis in the EA was "consistent with Administration priorities and polices including Secretary's Order No. 3399, requiring bureaus and offices to use the "same application or level of NEPA that would have been applied to a proposed action before the 2020 Rule [85 FR 43304 (July 16, 2020)] went into effect." Final EA at p.1, note 1.

29. The purpose of NEPA is to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

30. To carry out the purposes of NEPA, the Federal Government is to "use all practicable means" to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;" "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;" "preserve important … natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of

CLARKHILL\L1333\442094\269503402.v6-12/29/22

individual choice;" and "enhance the quality of renewable resources." 42 U.S.C. § 1331(b).

31. NEPA requires that federal agencies perform environmental analysis before taking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

32. NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C.Cir. 2013) (citing *Balt. Gas & Elec. Cop. V NRDC*, 462 U.S. 87, 97 (1983)). It also "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Id.*

33. NEPA ensures that important environmental effects will not be "overlooked or underestimated*." Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Public participation under NEPA serves to improve the agency's process by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *Department of Transp. v. Public Citizen,* 541 U.S. 752, 758 (2004).

34. NEPA's requirements "are to be strictly interpreted to the fullest extent possible in accord with the polices embodied in the Act." *Center for Biological Diversity v. Bernhardt,* 982 F.3d 723, 734 (9th Cir. 2020).

35. A threshold question in a NEPA case is whether a proposed project will "significantly affect" the environment, thereby triggering the requirement for an EIS. 42 U.S.C. § 4332(2)(C).

36. As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40

C.F.R. § 1508.9 (2005). An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact," (i.e., a FONSI). 40 C.F.R. § 1508.9 (2005).

37. If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

38. The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project." *Id*.

39. Taking a "hard look" includes "considering all foreseeable direct and indirect impacts*." Center for Biological Diversity v. Salazar,* 695 F.3d 893, 916 – 17 (9th Cir. 2012). The agency must also consider all cumulative effects. 40 C.F.R. § 1508.1 (2005).

40. The Court applies the "rule of reason" in evaluating whether an EA contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences*." Neighbors of Cuddy Mt. v. U.S. Forest Serv.,* 137 F.3d 1372, 1376 (9th Cir. 1998).

41. To "prevail on their claims that the Reclamation violated its statutory duty to prepare an EIS, Plaintiffs 'need not show that significant effects will in fact occur;' rather, Plaintiffs need only raise 'substantial questions whether a project may have a significant effect'" on the environment. *Hausrath v. United States Department of the Air Force*, 491 F.Supp.3d 770 (D. Id. 2020) (citations omitted).

**Administrative Procedures Act ("APA")**

42. The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Final agency actions "for which there is no other

CLARKHILL\L1333\442094\269503402.v6-12/29/22

adequate remedy in a court" are reviewable under the APA. *Id.* § 704.

43. The Court "shall (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusion found to be (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law…." *Id.* at §706.

44. "Within the context of NEPA, it is only required that the agency take a "hard look" at the environmental consequences before taking a major action. *See Baltimore Gas and Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87 1983. If the agency failed to take a "hard look", then its action is arbitrary and capricious."

### The Law of the River

45. The Law of the River is comprised of operating criteria, regulation, administrative decisions, federal statutes, interstate compacts, court decisions and decrees, international treaty, and contracts with the Secretary of the Interior. Some of the provisions of the Law of the River applicable here are discussed below.

46. The Colorado River Compact of 1922 divided the river into the Upper Basin and Lower Basin. The Upper Basin includes those portions of Arizona, Colorado, New Mexico, Utah, and Wyoming within and from which waters drain naturally into the Colorado River above Lee Ferry, Arizona. The Lower Basin consists of those portions of Arizona, California, Nevada, New Mexico, and Utah within and from which waters drain naturally into the river below Lee Ferry. The compact also divided the Colorado River Basin states into the Upper Division states and the Lower Division states. The Upper Division states are Colorado, New Mexico, Utah, and Wyoming. The Lower Division states are Arizona, California, and

CLARKHILL\L1333\442094\269503402.v6-12/29/22

Nevada.

47. The Boulder Canyon Project Act of 1928 ("BCPA"), 43 USC §§ 617 *et seq*., among other things, authorized the construction of Hoover Dam. It also authorized Arizona, California, and Nevada to enter into a compact that apportioned mainstream Colorado River Water to Arizona (2.8 million acre-feet), California (4.4 million acre-feet), and Nevada (0.3 million acre-feet). Although the states did not enter into a compact, the Supreme Court in *Arizona v. California,* 374 U.S. 340 (1964) as modified by 439 U.S. 419 (1979), 466 U.S. 144 (1984), and 531 U.S. 1 (2000)*,* affirmed Congress' intent to apportion the River in this manner. The BCPA authorized the Secretary to contract for storage and delivery of Colorado River water and prohibited use of Colorado River water except through such contract with the Secretary. These contracts, generally referred to as "section 5 water delivery contracts," are for permanent service. The Act also authorized representatives of the states to act in an advisory capacity to and in cooperation with the Secretary.

48. Under Article 10(a) of the *Utilization of Water of the Colorado and Tijuana Rivers and of the Rio Grande*—Treaty between the United States of American and Mexico, dated February 3, 1944, Mexico is entitled to an annual amount of 1.5 million acre-feet of Colorado River water. The Treaty also addresses delivery of water in an amount less than 1.5 million acre-feet in the event of extraordinary drought or other serious interruptions to the water delivery system.

49. The U.S. and Arizona entered into a Contract for the Delivery of Water dated February 9, 1944. The 1944 Contract established that the U.S. would deliver to the State, agencies, or water users within the State for the water stored in Lake Mead to points of diversion on the

12

mainstream of the Colorado River that may be necessary for the beneficial consumptive use of irrigation and domestic uses in Arizona. Arizona was allocated 2.8 million acre-feet annually ("AFA"). The 1944 Contract made the annual obligation to deliver water for Arizona subject to the BCPA.

50. In *Arizona v. Colorado*, the Supreme Court affirmed the apportionment of water under the BCPA to Arizona, California, and Nevada and provided that the water may be released to satisfy the 1944 Water Treaty. The Court also recognized certain Federal reserved rights and provided a process to quantify all claimed Present Perfected Rights ("PPRs"), those water rights based upon diversion and beneficial use prior to the effective dates of the BCPA (June 25, 1929). All PPRs were numbered, and their dates of priority were set forth in the supplemental Decree entered on January 9, 1979 as modified by supplemental decrees in 1984 and 2000. In Arizona, priorities are as follows:

   a.   First Priority: Satisfaction of PPRs as defined and provided for in the Decree.

   b.   Second Priority: Satisfaction of Secretarial Reservations and Perfected Rights established or effective prior to September 30, 1968.

   c.   Third Priority: Satisfaction of Entitlements pursuant to contracts between the United States and water users in Arizona executed on or before September 30, 1968.

   d.   Fourth Priority: Satisfaction of Entitlements pursuant to (i) contracts, Secretarial Reservations, Perfected Rights, and other arrangements between the United States and water uses in Arizona entered into or established subsequent to September 30, 1968 for use on Federal, State, or private lands in Arizona not to

CLARKHILL\L1333\442094\269503402.v6-12/29/22

exceed 164,652 acre-feet of diversions annually; and (ii) Contract No. 14-06-W-245 dated December 15, 1972 between the United States and the Central Arizona Water Conservation District ("CAWCD") for delivery of Mainstream Water for the CAP, including use of Mainstream Water on Indian Lands.

    e.   Fifth Priority: Satisfaction of Entitlement to any Unused Arizona Entitlement or Unused Apportionment Water.

    f.   Sixth Priority: Satisfaction of Entitlements to Surplus Water.

51. The Colorado River Basin Project Act of 1968 ("CRBPA") authorized the construction of the CAP, among other projects. It also required the Secretary to develop the long-range and annual plans of operation of the Colorado River Reservoirs.

52. The 2007 Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead ("2007 Interim Guidelines") were adopted to provide management strategies to address operation of Lake Powell and Lake Mead under low reservoir conditions. These Guidelines provided, among other things, how the Colorado River would be managed and how water reductions would be allocated in times of shortages. Shortages are to be determined based on the elevation of Lake Powell and Lake Mead. In times of shortage, Arizona would take the biggest reduction of water ranging from 320,000 to 480,000 acre-feet per year based on the elevation of Lake Mead. Nevada and Mexico would also take reductions. The 2007 Interim Guidelines are effective thorough 2026.

53. In 2019, the 2007 Interim Guidelines were modified in part by the Lower Basin Drought

14

Contingency Plan ("LB DCP") Agreement, attached as Exhibit 11.[3] The LB DCP Agreement modified the amount of reductions that Arizona, California, Nevada, and Mexico would take during times of shortages:

| Tier | Elevation of Lake Mead MSL | Reduction | | | | |
|------|----------------------------|-----------|------|------|------|------|
| | | AZ | NV | CA | MX | BOR |
| Zero | Less than 1,090' | 192,000 | 8,000 | - | 41,000 | 100,000 |
| 1 | Less than 1,075' | 512,000 | 21,000 | - | 80,000 | |
| 2a | Less than 1,050' | 592,000 | 25,000 | - | 104,000 | |
| 2b | Less than 1,045' | 640,000 | 27,000 | 200,000 | 146,000 | |
| 3 | Less than 1,025" | 720,000 | 30,000 | 350,000 | 275,000 | |

A true and correct copy of the CAP Colorado River Shortage Fact Sheet is attached hereto as Exhibit 12.

54. The Secretary is vested with the responsibility for managing the mainstream waters of the Lower Colorado River ("LCR") from Lee Ferry, Arizona to the Southerly International Boundary between the United States and Mexico. Reclamation's Lower Colorado Basin Region performs the Secretary's responsibilities of oversight and management of the LCR.

**STANDARD OF REVIEW**

55. An agency action is arbitrary and capricious if the agency:

   A.  has relied on factors which Congress has not intended it to consider,

   B.  entirely failed to consider an important aspect of the problem,

---

[3] The LB DCP Agreement and Exhibit 1 thereto, Lower Basin Drought Contingency Operations can be accessed at:
https://www.cap-az.com/water/water-supply/protecting-cap-reliability/drought-contingency-plan/.

C.  offered an explanation for its decision that runs counter to the evidence before the agency,

D.  is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, or

E.  relied on data that is too stale to carry the weight assigned to it.

*Bark v. United States Forest Service*, 958 F.3d 865, 869 (9th Cir. 2020).

56. Although the review is highly deferential, the Court does not automatically defer to any agency's conclusions, even when those conclusions are scientific. Rather, the Court's review must be sufficiently probing to ensure that the agency's decision is founded on a reasoned evaluation of the relevant factors. *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 994, 995 (9th Cir. 2014).

57. An agency's decision will have a significant effect and an EIS will be required if the possible effects on the human environment are highly uncertain, if uncertainty may be resolved by further collection of data, or if the collection of such data may prevent speculation on potential effects. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir.2005).

58. General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided. *Bark.*, 958 F.3d at 872.

59. If there is no quantitative assessment undertaken in the EA to assess the impact of the action with the background levels of impacts that must be added to the impact of the action, the agency action is arbitrary and capricious. *Hausrath v. U.S. Dep't of the Air*

*Force*, 491 F. Supp. 3d 770, 789 (D. Idaho 2020).

60. If an agency estimates baseline conditions, whether through use of a computer model or some other reasonable method, the assessment must be based on accurate information and defensible reasoning. *Id.* at 789 (quoting *Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016)).

61. When there is no metric identified, no species identified, and no scientific literature referenced to support the agency conclusion, its decision is arbitrary and capricious. *Id. at* 795.

62. The agency's cumulative analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects. *Id.,* at 789 (quoting *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005)).

63. In considering cumulative impacts, an agency must provide "some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Hausrath v. U.S. Dep't of the Air Force*, 491 F. Supp. 3d 770, 789 (D. Idaho 2020) (quoting *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005)).

## FACTUAL ALLEGATIONS

A. **The 20-year megadrought has brought the Colorado River to the brink of "catastrophic collapse."**

CLARKHILL\L1333\442094\269503402.v6-12/29/22

64. The Colorado River was ranked as the most endangered river in the United States in 2022.[4]  Rising temperatures and a 20-year drought driven by climate change have brought the river to the brink of disaster.

65. According to the Assistant Secretary of the Interior for Water and Science, "In order to avoid catastrophic collapse of the Colorado River System and a future uncertainty and conflict, water use in the Basin must be reduced."[5]

66. On August 16, 2022, the Commissioner recognized that "as water stewards" of the Colorado River, Reclamation is responsible "to protect the system and the millions of Americans who depend on it." She declared that "Today, Reclamation starts the process on actions we can take to deliver on those responsibilities." *Id.*

67. In 2020 and 2021, the Lower Colorado River was in Tier Zero shortage resulting in Arizona taking a reduction of 192,000 acre-feet of river water.

68. For 2022, the Colorado River was in a Tier 1 shortage resulting in Arizona losing 512,000 acre-feet of water from the Colorado River.

69. In addition, Reclamation held back 480,000 acre-feet in Lake Powell from being released to Lake Mead, but that amount was credited as being stored in Lake Mead.

70. In August of 2022, Reclamation declared a Tier 2a for Lake Mead for 2023 that will result in Arizona taking a reduction of 592,000 acre-feet of water from the Colorado River.

---

[4] https://endangeredrivers.americanrivers.org/colorado-river/
[5] https://www.doi.gov/pressreleases/interior-department-announces-actions-protect-colorado-river-system-sets-2023

CLARKHILL\L1333\442094\269503402.v6-12/29/22

71. Even with these actions to protect water levels in Lake Powell and Lake Mead, water elevations continue to plummet; Reclamation has called for an additional voluntary reduction of 2 to 4 million-acre feet of Colorado River water.

72. Reclamation's worst-case 24-month projections from August 2022 for Lake Powell show that the elevation of the water level could fall below the minimum level necessary to generate power and stay there until May of 2023.

73. Reclamation's most-likely 24-month projections for Lake Mead show that water levels will fall below Tier 3 shortage conditions in June of 2023 and remain there until the end of January 2024. A true and correct copy of the Lake Mead End of Month Elevations, Projections from the August 2022 24-Month Study is attached hereto as Exhibit 13.

74. On March 3, 2022, prior to the release of the Draft EA, Reclamation notified LCR MSCP Steering Committee and Permittees that "ESA Section 7 consultation has been requested to be initiated with the U.S Fish and Wildlife Service to provide coverage for flow reductions up to 1.574 million acre-feet between Hoover Dam and Parker Dam (Reaches 2 and 3)." Reclamation explained that "Section 7 consultation is needed to facilitate important water conservation actions that are designed to minimize the risk of ongoing historic drought in the Colorado River Basin causing Lake Mead to decline to levels that would significantly threaten downstream water deliveries to water uses in Arizona, California, Nevada, and the Republic of Mexico." Reclamation further explained that a "precipitous decline in Lake Mead elevations could also adversely impact species present in Lake Mead and in downstream riparian and aquatic areas." Final EA Appendix E Response to Comments 4-5.

**B.  The 2004 LCR MSCP**

75. The LCR MSCP was published in December of 2004 to:

    A. develop and implement a plan to "conserve habitat and work toward recovery of threatened and endangered species as well as reduce the likelihood of additional species being listed";

    B. "accommodate present water diversions and power production and optimize opportunities for future water and power development to the extent consistent with the law"; and

    C. "provide the basis for incidental take authorizations."

LCR MSCP, Volume II: Habitat Conservation Plan, p. 1-3.

76. The LCR MSCP "planning area comprises areas up to and including the full-pool elevations of Lakes Mead, Mohave, Havasu and the historical floodplain of the Colorado River from Lake Mead to the [Southernly International Boundary] SIB." *Id*. at 1-9. The planning area is divided into seven reaches:

    A. Reach 1- from Separation Canyon in the lower end of the Grand Canyon to Hoover Dam, including Lake Mead up to full-pool elevation;

    B. Reach 2- from Hoover Dam to Davis Dam inducing Lake Mohave up to full pool elevation;

    C. Reach 3 – from Davis Dam to Parker Dam including Lake Havasu up to full-pool elevation;

    D. Reach 4 – from Parker Dam to Adobe Ruin and Reclamation Cibola Gage at the lower end of Reclamations maintenance Cibola Division;

20

E.  Reach 5 – from the Cibola Gage to Imperial Dam;

F.  Reach 6 – from Imperial Dam to the Northerly International Boundary (NIB); and

G.  Reach 7 - portion of the LCR from the NIB to the SIB within the United States.

*Id.* at 1-9 to 1-10.

77. The LCR MSCP is for a 50-year term.

78. The LCR MSCP assumes water diversions of up to 7.5 million acre-feet a year for water contractors in Arizona, California, and Nevada. The LCR MSCP contemplates that future changes in points of diversion, occurring in response to shifts in water demand during the term of the LCR MSCP will result in reduced releases from Hoover Dam and Parker Dam. The LCR MSCP covers these anticipated changes in points of diversion of up to 1.57 million-acre feet for water contractors in Arizona, California, and Nevada. The LCR MSCP assumes a "worst-case scenario" for quantities of water that may be transferred as a result of future projects. The LCR MSCP assumes that much of the water transferred will upstream to Lake Mead or to Lake Havasu. *Id*. at 2-2 to 2-3

79. The LCR MSCP assumes that Arizona will receive its full apportionment of 2.8 million acre-feet of water per year, plus surplus water, plus any unused apportionment. The LCR MSCP assumes that Arizona will have changes in points of diversion of up to 200,000 acre-feet annually of the 1.574 million acre-feet. *Id*. at 2-6. This amount includes changes of diversions of Arizona entitlements within Reach 2, including the City of Kingman. *Id.*

80. The LCR MSCP assumes California will have changes in points of diversion of up to 800,000 acre-feet annually of the 1.574 million acre-feet, and Nevada will have changes in

points of diversion of up to 233,000 acre-feet annually of the 1.574 million acre-feet. *Id*. at 2-13 and 2-17.

81. The LCR MSCP explains that the 1.574 million-acre feet of future changes in points of diversion includes both i) the 1.233 million-acre feet annual changes in points of diversion for Arizona, California, and Nevada set out in Chapter 2; and ii) "shortages" of river flows. *Id*. at 4-2. This means, of the 1.574 acre-feet of water diversions the LCR MSCP covers, the maximum amount of water attributed to future shortages in the "worst case scenario" was 341,000 acre-feet annually.

82. At Tier Zero in effect in 2020 and 2021, the total reductions of 341,000[6] equaled the entire 341,000 acre-feet of year of shortages accounted for in in the LCR MSCP. The 341,000 AFA reductions at Tier Zero equal 21% of the 1.574 million-acre feet used in the LCR MSCP.

83. At Tier 1 in effect for 2022 while the Draft EA and Final EA were being prepared, the total reductions of 713,000 acre-feet exceed the shortages covered in the LCR MSCP by 372,000 acre-feet and equal 45% of the total 1.574 million-acre feet used in the LCR MSCP.[7]

84. At Tier 2a in effect for 2023, the total reductions of 821,000 acre-feet exceed the shortages covered in the LCR MSCP by 480,000 acre-feet and equal 52% of the total 1.574 million-acre feet used in the LCR MSCP. [8]

---

[6] The reductions are Arizona – 192,000, Nevada – 8,000, Mexico – 41,000, and Reclamation – 100,000 acre-feet, equaling a total of 341,000 acre-feet.

[7] The reductions are Arizona – 512,000, Nevada – 21,000, Mexico – 80,000, and Reclamation – 100,000, equaling a total of 713,000 acre-feet.

[8] The reductions are Arizona – 592,000, Nevada – 25,000, Mexico – 104,000, and

CLARKHILL\L1333\442094\269503402.v6-12/29/22

**C.  The GSC Farm to Queen Creek Transfer**

85. GSC Farm owns approximately 504 acres of agricultural land in Cibola Valley in La Paz County. GSC Farm has a contract for fourth priority water to divert 2,913.3 AFA and consumptively use 2,083.01 AFA for use on the land.

86. GSC Farm and the Town of Queen Creek have entered into an agreement to have GSC Farm transfer 2.033.01 acre-feet of its Arizona fourth priority water to Queen Creek for municipal use. GSC Farm will retain 50 acre-feet of its fourth priority water for rural residential development on its land. This is the first transfer of mainstream Colorado River water off the river for municipal use halfway across the state of Arizona.

87. Queen Creek does not need the fourth priority Colorado River water because it has "legal access to groundwater supplies needed to support its current demand and planned development within its water service area." Final EA at p. 5. Instead, it will store the water in Groundwater Savings Facilities ("GSF") to reduce its reliance on groundwater.

88. A GFS "is not a constructed facility;" instead, a water user "agrees to reduce its groundwater pumping for an equal amount of renewable supplies delivered to its facility. The renewable supplies are also referred to as "in-lieu" water. By leaving the groundwater in the aquifer, water is in essence "saved" underground. Arizona Water Banking Authority Water Storage.[9] Here, the fourth priority Colorado River water being delivered to Queen Creek is the "in-lieu" water.

Reclamation – 100,000, equaling a total of 821,000 acre-feet.

[9] Arizona Water Banking Authority Water Storage available at: https://waterbank.az.gov/water-storage.

89. The Final EA states that Queen Creek will transfer the water in the months of April through August of 2023. Final EA at 26, Table 3.

90. Upon information and belief, Queen Creek now intends to begin diverting the water beginning sometime in February of 2023.

91. The transfer requires Reclamation to execute the following documents:

    A. The partial assignment and transfer of Arizona fourth priority Colorado River water entitlement between GSC Farm and Queen creek,

    B. A Colorado River water delivery contract between the United States and Queen Creek,

    C. An amendment to the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Arizona fourth priority Colorado River water entitlement, and

    D. An 8.17 Wheeling Contract with Queen Creek to wheel the transferred fourth priority Arizona Colorado River water entitlement to Queen Creek through the CAP system.

(Collectively the "Transfer Documents").

**D.** **Future Water Transfers Are Reasonably Likely**

92. Future water transfers of mainstream Colorado River water off the river to urban areas are reasonably likely. GSC Farm is a subsidiary of Phoenix-based Greenstone, which is a water developer that owns thousands of acres of land in Yuma and La Paz. Greenstone's express purpose is to buy land for water rights to transfer those rights to others.

93. Greenstone is "a water company that works with local governments, business and

24

developers who seek to increase either the quantity and/or reliability of their water supplies."[10]   Greenstone's "goal is to advance water transactions that benefit both the public good and private enterprise by providing solutions for the future economic development and diversity of the western United States."[11] Greenstone lists the GSC Farm – Queen Creek water transfer as one of its transactions.[12]

94. Upon information and belief, Greenstone and its related entities own approximately 8,863 acres in three Arizona Counties including La Paz and Yuma. Letter from Mohave to Reclamation dated April 14, 2022 regarding Comments to the Draft EA, attachment 3, James and Hing, *Investors are buying up rural Arizona farmland to sell the water to urban homebuilders*, Arizona Republic Nov. 25, 2021, updated Nov.26, 2021. Greenstone's purpose is to buy water assets and sell those assets to governments, businesses, and developers. The GSC Farm – Queen Creek sale and transfer of mainstream Colorado River water is the first for Greenstone and will act as a blueprint for future transfers of mainstream Colorado River water.

95. Reclamation recognized that "future water transfers are possible," Final EA at Table E-2 Reponses at 2-3. But Reclamation refused to analyze any future, reasonably probable transfers of Colorado River water because it deemed any specific transfer to be speculative. *Id.* at Response to Comment 4-10.

---

10 https://greenstonerp.com/home-page
11 *Id.*
12 https://greenstonerp.com/transactions

CLARKHILL\L1333\442094\269503402.v6-12/29/22

**E.  Reclamation Failed to Take a Hard Look at the Environmental Consequences of the Proposed Action**

96. Reclamation failed to take a hard look at the consequences of the proposed action. Its failure to do so was arbitrary and capricious, an abuse of discretion, and contrary to law and procedure required by law.

### a.  Global Warming and Drought Response

97. Reclamation failed to analyze the effects of climate change, the ongoing megadrought, and their effect on the Colorado River. The Final EA contains no discussion of how climate change and the corresponding increase in temperatures has brought the Colorado River to the brink of "catastrophic collapse" (in the words of the Assistant Secretary of the Interior for Water and Science). There is no analysis of how transferring mainstream Colorado River water off the river "deliver[s] on" Reclamation's "responsibilities" to "protect the system and the millions of Americans who depend on it."

98. In response to comments submitted in response to the Draft EA regarding the megadrought and climate change, Reclamation responded that it analyzed these conditions in Section 3.6 of the Final EA regarding cumulative actions. Final EA Appendix E at Response to Comments 4-1, 4-12. 4-13, 5-2, 6-3, and 6-5.

99. Yet, in Section 3.1 of the Final EA, Reclamation determined that "after reviewing the potential effects of the resourced listed in Table 2," it did not need to perform "a more detailed analysis and compar[e] [] the direct, indirect, and cumulative effects of the Proposed Action and alternatives" for those resources listed in Table 2. Final EA pp. 17-19.

26

100.    Contrary to Reclamation's response to Comments, Table 2 lists Global Climate Change as one of the items that Reclamation chose **not** to analyze. This entry does not discuss any effect of climate change on the flows of the Colorado River. Reclamation merely stated that it determined that the transfer of water would not change the overall emission of greenhouse gases.

101.    Section 3.6 refers to Table 10, where Reclamation sets forth its discussion of the effects of cumulative actions. Final EA. pp 38-46. Table 10 lists Global Climate Change as a cumulative effect. Reclamation states that

> Global Climate change has been identified as a contributor to drought conditions in the Colorado River watershed resulting water shortages on the river and the increase in greenhouse gases in the atmosphere globally has been identified as the principal driver of global climate change. The extended drought conditions in the Colorado River watershed and the associated reductions in water stored in the Colorado River System in turn could affect the availability of water for diversion and use in any of the alternatives considered in this EA. Ongoing drought contingency planning and negotiated stakeholder response to extended drought conditions in the Colorado River watershed may partially mitigate these impacts.

*Id*. at 46.

102.    Reclamation's statements regarding climate change in the Final EA are inconsistent, confusing, and fail to show a reasoned evaluation of the climate change. Reclamation states it is not performing a cumulative effect on analysis on climate change but includes climate change as a cumulative effect. Does this mean the discussion in Table 10 is not a cumulative effects analysis regarding climate change but Reclamation's statement that it did not need to perform "a more detailed analysis and compar[e] [] the direct, indirect, and

27

cumulative effects of the Proposed Action and alternatives"? This is not a reasoned evaluation of the factor and fails to inform the public regarding its decision-making process.

103.   Moreover, the statements are conclusory, vague, and speculative. Reclamation relies on no data or scientific literature to support its conclusions. Indeed, the statements fail to identify or quantify the "resulting water shortages on the river" caused by climate change or how the extended drought "could affect the availably of water for diversion and use." The statement that ongoing drought "contingency planning and negotiated stakeholder response … may partially mitigate these impacts" is not only conclusory and speculative, but contrary to the known facts. These contingency planning and stakeholder responses failed to maintain the levels of Lakes Mead and Powell and required the Commissioner to call for voluntary reductions of an additional 2 to 4 million acre-feet of water to be left in Lakes Powell and Mead that would not be available for diversion. Reclamation fails to analyze this information.

104.   Reclamation also discusses drought in another entry on Table 10: "2007 Colorado River Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead, 2019 Lower Basin Drought Contingency Plan (LBDCP: Arizona Water Banking Authority 2019), Lower Colorado River Basin 500+ Plan (ADWR 2021) and other drought response activities." Final EA p. 43.

105.   Reclamation catalogues the 2007 Guidelines, the 500+ Plan that "aims to add 500,000 acre-feet of additional water to Lake Mead in both 2022 and 2023," and Reclamation's call to have the Colorado River Basin States voluntarily conserve an additional 2 and 4 million

acre-feet of water in 2023. This cataloguing of activities is done without any analysis. Reclamation fails to point out that the 550+ Plan and Reclamation's efforts to conserve 2 to 4 million acre-feet of water are necessary because the efforts to maintain the levels of Lakes Mead and Powell have failed. Reclamation provides no analysis of its ongoing efforts to conserve 2 to 4 million acre-feet of water or if the 500+ Plan is on target to meets its goals for 2022 and 2023.

106.    Reclamation states that drought water conservation activities "may reduce availability of water within the Colorado River Basin for all uses including farming," "may impact the quality of habitat for special status species," and "could affect the availability of water for diversion and use in any of the alternatives considered." Reclamation states that "[o]ngoing contingency planning and negotiated stakeholder responses to ongoing drought conditions … would mitigate these impacts to the extent possible."

107.    As with its discussion in Global Climate Change, Reclamations' statements are conclusory, vague, and speculative. Reclamation relies on no data or scientific literature to support its conclusions. Indeed, the statements fail to identify or quantify the "resulting water shortages on the river" or how the reductions "could affect the availably of water for diversion and use." The statement that ongoing "contingency planning and negotiated stakeholder response … would mitigate these impacts to the extent possible" is again conclusory and speculative and fails to point out that these responses implemented so far have failed to maintain the levels of Lakes Mead and Powell requiring the Commissioner to seek an additional 2 to 4 million acre-feet of water to be left in Lakes Powell and Mead. Reclamation fails to analyze this information.

29

108.   Finally, Reclamation mentions that current modeling showed that some level of Tier 2 shortage would be implemented under the DCP in 2023 after the August 2022 modeling was performed. Reclamation mentions the water levels in Lake Mead that triggered a Tier 1 and Tier 2 shortage, but not the amount of water that would not be available for diversion. It makes no analysis of how these reductions will affect the River, diversions, or species habitat. It makes no analysis of how allowing mainstream Colorado River water to be transferred off the river is consistent or inconsistent with the ongoing drought response activities. Reclamation's analysis failed to take a hard look at the cumulative effects of drought and climate change and its actions were arbitrary and capricious.

### b.   Reliance on the 2004 LCR MSCP

109.   Instead, Reclamation relies on the 2004 LCR MSCP to justify its conclusion that there is no significant impact from the proposed action. Final EA, pp. 23,24 25-26, 27, 28, 29, 45 at Table 10, 47, 48, and Appendix E - Responses to Comments 4-5, 4-6, and 6-8.

110.   For example, Reclamation states that

> The LCR MSCP covers projects and activities that include the annual consumptive use of up to 2.8 million AF of Arizona's basic apportionment (LCR MSCP 2004a). Future volume of diversions, discharges, return flows, which may include changes to points of diversion, new points of divers, intestate water banking, water marketing, water transfers, inadvertent overruns, or any other actions made possible from any future agreements by ADWR or contract holders(s) are covered by the LCR MSCP (LCR MSCP 2004a). The LCR MSCP encompasses the entirety of GSC Farm property and authorizes take of listed species that might be associated with reductions in flow of up to 1.57 million AFY from the river between Parker Dam and Imperial Dam (River Reaches 4 and 5 of the LCR MSCP). [Footnote

30

omitted].

Final EA pp. 25 to 26.

111.   Similarly, Reclamation states that the "reduction in river flow associated with the Proposed Action has been evaluated by (and is covered under) the LCR MSCP." Id. at 27.

112.   Table 10 lists out cumulative actions relating to the LCR MSCP. The first entry is for LCP MSCP Actions (Reclamation 2021, LCR MSCP 2004a, 2004b). The actions listed include riprap replacement and maintenance, construction of haul roads, various minor structural maintenance and construction, stocking of razorback sucker and bonytail chub, the Cibola Valley Conservation area, Cibola NWR Unite#1, and the Palo Verde Ecological Reserve, planting trees and other plants to create riparian habitats, and revegetation activities. *Id*. at 45

113.   The second entry in Table 10 is "2020 Flow Changes Below Parker Dam to Imperial Dam (as covered under the LCR MSCP) (Reclamation 2021)." The entry states that

> Collectively, the actions contributed to a net reduction in flow below Parker Dam of 455,422 AF on a consumptive use basis, with the LCR MSCP reduction in flow coverage of 1.574 million AFY in the Parker Dam to Cibola Gage Reach. The reduction in water flow within the reach of the Colorado River below Parker Dam cumulatively with the Proposed Action or Partial Assignment and Transfer of 1,078.01 AFY Alternative, will further reduce the water available between Parker Dam and the CVIDD diversion for special-status species and their habitats, but this reduction in flow will not exceed the reduction in flow coverage provided by the LCR MSCP.

*Id*.

114.   This catalogue of cumulative actions without any analysis is inadequate under NEPA.

The statements are vague. When it states that "the actions" contributed to a net flow below Parker Dam, it is unclear what "actions" are being referred to: the actions set forth in the proceeding section on Table 10 or all actions contemplated under the LCR MSCP in the Reach 4. It is also unclear whether the 455,422 acre-feet net reduction in flows in Reach 4 are for action taken in Arizona or in California and Nevada as well. This lack of clarity is not the "hard look" NEPA requires.

115.   In addition, the Final EA fails to set forth how much of the entire 1.574 million acre-feet of projected reductions have been accomplished or "used". Reclamation states repeatedly that the project's reduction in flows to the river are within the 1.57 million acre-feet covered by the LCR MSCP but fails to explain how much of the capacity remains uncommitted. If the entire capacity has been used, then the reductions contemplated by the proposed action are not within the 1.574 million acre-feet because that amount of capacity no longer exists. Nor does Reclamation explain how much of Arizona's allocation, 200,000 acre-feet, of the 1.574 million acre-feet has been used. Again, without this analysis it cannot be known whether the project's reductions in flows to the river are within Arizona's allocation of 200,000 acre-feet. Reclamation's failure to address these issues is arbitrary and capricious.

116.   Moreover, Reclamation fails to explain how the dramatic increase in shortages, has affected the availably of the 1.574 million acre-feet covered by the LCR MSCP. For 2022, the shortages at Tier 1 totaled 713,000 acre-feet thereby exceeding the 341,000 AFA available for water shortages covered in the LCR MSCP by 372,000 acre-feet. These shortages equal 45% of the entire 1.574 million acre-feet covered by the LCR

32

MSCP. Even if capacity continues to exist for projects, Reclamation fails to address how the shortage of 713,000 AFA in reductions triggered by the Tier 1 shortage effect any capacity that may be remaining. For example, just the 713,000 acre-feet of shortage under Tier 1 in 2022 and the 455,422 acre-feet used in Reach 4 (Table 10) equals 1,168,422 acre-feet, already 405,578 acre-feet in excess of the 1.57 million acre-feet covered by the LCR MSCP. Just these two items show that no capacity exists under the LCR MSCP. Contrary to Reclamation's assertions, this Water Transfer's "reduction in river flow associated with the Proposed Action has **[not]** been evaluated by (and is **[not]** covered under) the LCR MSCP." *Id*. at 27 (emphasis added).

117.    Moreover, except in response to comments, Final EA Appendix E Response to Comments 4-5, 4-6, Reclamation fails to mention or discuss that it has reinitiated consultation on the LCR MSCP under Section 7 of the ESA because Reclamation anticipates additional flow reductions of 1.574 million AFA between Hoover Dam and Parker Dam not covered or contemplated in the 2004 LCR MSCP. Yet, Reclamation continues to rely on the 2004 LCR MSCP without explaining that it has reinitiated consultation on the 2004 LCR MSCP because an additional reduction in flows of 1.574 million acre-feet is anticipated and not covered in the 2004 LCR MSCP, how this additional reduction in flows may affect the activities covered in the 2004 LCR MSCP, and how Reclamation is justified in continuing to rely on the 2004 LCR MSCP even though it did not account for the additional reductions in flow of 1.574 million acre-feet in the 2004 LCR MSCP.

118.    In response to comments, Reclamation's statement is that the additional flow reductions

only affect Reaches 2 and 3. Reclamation's statements are conclusory without any analysis. It does not constitute the analysis necessary to constitute a hard look at the environmental consequences. Reclamation fails to make the analysis that could explain its justification in continuing to rely on the 2004 LCR MSCP. Moreover, Reclamation fails to analyze how the reductions in flow of 1.574 million AFA between Hoover Dam and Parker Dam may affect Lake Havasu's water elevations, whether any reduction in storage in Lake Havasu may impact releases from Parker Dam, if so the expected range in magnitude of the reductions in releases from Parker Dam, and how theses reduced releases may impact divisions. It fails to address how endangered species' habitats may be affected if Lake Havasu water elevations fall and releases from Parker Dam are impacted. It fails to address whether the decreased water elevations in Lake Havasu may affect power production from Parker Dam and what the effects may be from this reduction.

### c.  Failure to Consider the Precedent Set by the Transfer

119.   Reclamation refused to analyze the precedential nature of this transfer because it stated future transfers were speculative or it did not know of any specific transfers. Final EA at Appendix E, Response to Comments 2-3, 4-8, 4-10. 5-3, 6-2, 6-13.

120.   Reclamation recognized that future transfers "would be connected actions to be considered." *Id*. at Response to Comment 2-3.

121.   Reclamation also recognized that

> reasonably foreseeable future actions include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur that a Responsible Official of ordinary prudence would take such activities

into account in reaching a decision. These federal and non-federal activities that must be taken into account in the analysis of cumulative impacts include, but are not limited to, activities for which there are existing decisions, funding, or proposals identified by the bureau. Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite.

*Id*. at 4-10, quoting 43 CFR § 46.30.

122.    Reclamation refused to consider whether it is sufficiently likely that a company whose sole purpose is to purchase water rights to transfer those water rights, who has purchased thousands of acres of agricultural land along the Colorado River with tens of thousands of acre-feet of appurtenant water rights, and who has requested Reclamation to approve the first ever transfer of mainstream Colorado River water off the river to support urban growth halfway across the state is sufficiently likely to seek to transfer those other tens of thousands of acre-feet of water it bought for the purpose of selling and transferring those water rights. Reclamation failed and refused to make this inquiry. Reclamation failed to make the inquiry that a Responsible Official of ordinary prudence would take into account in reaching a decision. Reclamation summarily dismissed the precedential nature of this transfer as speculative with no analysis.

123.    Not only it is it sufficiently likely, it is highly likely that Greenstone will seek to transfer those water rights in the future (because that is its business model) and was using this transfer as a blue print for its future actions.

124.    Reclamation could have easily asked Greenstone, the project proponent, what other properties it owned along the Colorado River, what its plans were for these other properties, whether it intended to transfer those water rights off the river in the future. It did not, or if

it did, it failed to report this in the Final EA.

125.    Even without asking Greenstone, Reclamation could have determined the amount of land and water rights Greenstone owned along the Colorado River and analyzed the impact of transferring some or all of this water off the Colorado River. Reclamation could have analyzed what impact and affect these reasonably likely future transfers would have on biological resources and species habitat, would be and the impact on river flow, air quality, socioeconomic resources, and environmental justice. Instead, Reclamation refused to do so.

### d. Failure to Consider the Future Growth of Queen Creek

126.    Reclamation was required to consider reasonably foreseeable future actions, including "federal and non-federal activities" (43 C.F.R. § 46.30) "regardless of what agency. . . . or person undertakes such other actions" (40 C.F.R. § 1508.7 (2005)); however, Reclamation explicitly chose to not do so, as documented in its Final EA:

> Further, Queen Creek's projected development and water demand include development of the land within its jurisdiction, which is scheduled to occur even without the proposed water transfer. It would be speculative for Reclamation to project what additional growth, beyond build-out, could eventually be approved by Queen Creek that this proposed water transfer could support as an assured water supply. Development of Queen Creek is a matter of state and local jurisdiction. Future development activities in Queen Creek are not induced by nor do they rely on the water to be transferred; therefore, any future development activities that might use this water are outside of the scope of federal action considered in this EA.

Final EA at p. 5.

127.    Reclamation, by its own admission, was aware that future development of Queen Creek

is "scheduled to occur"—i.e., it is reasonably foreseeable that there will be future development and water demand by Queen Creek. As such, Reclamation was obligated to consider the impacts of such future developments, regardless of such development being undertaken by another entity.

128.   Reclamation's failure to consider the impacts of the planned development of Queen Creek signifies a failure to provide a useful analysis of the cumulative impacts of past, present, and future projects, as well as a failure to factor in the indirect—i.e., related—"effects on air and water and other natural systems, including ecosystems" that would be induced by the proposed transfer. *See* 40 C.F.R. § 1508.8(b) (2005).

129.   Reclamation's "straightforward announcement" of its failure to consider the potential consequences of future development activities "naturally undercuts any argument" that the FONSI and Final EA "are acceptably quantified and detailed to amount to a NEPA-compliant cumulative impacts analysis." *See W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 994 (D. Idaho 2021).

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Violations of NEPA and the APA)

130.   Paragraphs 1 through 129 are realleged as if fully set forth hand incorporated herein by this reference.

131.   Reclamation's approval of the GSC Farm to Queen Creek Water Transfer constitutes a major federal action that will significantly affect the quality of the human environment. Reclamation had a duty under NEPA to prepare an EIS or an adequate EA that took a hard

37

look at the environmental impacts of the transfer.

132.    Reclamation failed to prepare an EIS or an adequate EA that took a hard look that the environmental impacts of the transfer before approving the transfer and entering into the Transfer Documents:

   A.  The partial assignment and transfer of Arizona fourth priority Colorado River water entitlement between GSC Farm and Queen creek,

   B.  A Colorado River water delivery contract between the United States and Queen Creek,

   C.  An amendment to the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Arizona fourth priority Colorado River water entitlement, and

   D.  An 8.17 Wheeling Contract with Queen Creek to wheel the transferred fourth priority Arizona Colorado River water entitlement to Queen Creek through the CAP system.

133.    Reclamation failed to sufficiently analyze the significant impacts of the transfer and entered into the Transfer Documents in violation of NEPA.

134.    Reclamation's failure to comply with NEPA prior to its approval of the transfer and entering into the Transfer Documents constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and procedure required by law. 5 U.S.C. § 706(2)(A),(D).

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that this Court:

CLARKHILL\L1333\442094\269503402.v6-12/29/22

A. Find and declare that Reclamation's failure to prepare an EIS or an adequate EA that took a hard look at the significant impacts and environmental effects of the transfer violates NEPA.

B. Find and declare that Reclamation's approval of the transfer is arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law and without observance of the procedure required by law.

C. Order Defendants to comply with NEPA by preparing an EIS or an adequate EA for the transfer.

D. Vacate, set aside, and rescind Reclamation's approval of the transfer and its contracts implementing the transfer including

    a. The partial assignment and transfer of Arizona fourth priority Colorado River water entitlement between GSC Farm and Queen creek,

    b. A Colorado River water delivery contract between the United States and Queen Creek,

    c. An amendment to the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Arizona fourth priority Colorado River water entitlement, and

    d. An 8.17 Wheeling Contract with Queen Creek to wheel the transferred fourth priority Arizona Colorado River water entitlement to Queen Creek through the CAP system.

E. Enjoin Defendants from taking any action pursuant to the transfer and the contracts implementing the transfer until Defendants have fully complied with

CLARKHILL\L1333\442094\269503402.v6-12/29/22

NEPA.

F.  Award Plaintiffs their costs of litigation, including reasonable attorneys' fees.

G.  Grant any other relief as the Court deems just and proper.

Dated this 30th day of December, 2022.

Clark Hill

By: /s/ *John Lemaster*

John Lemaster – AZ 011588
CLARK HILL
3200 North Central Avenue, Suite 1600
Phoenix, AZ 85012
(602) 440-4800
Attorneys for Plaintiffs

CLARKHILL\L1333\442094\269503402.v6-12/29/22