1    **WO**

2

3

4

5

6                 **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

9    County of Mohave, et al.,                    No. CV-22-08246-PCT-MTL

10                    Plaintiff,                   **ORDER**

11   v.

12   United States Bureau of Reclamation, et al.,

13                    Defendants.

14

15         Pending before the Court is Plaintiffs Mohave County, La Paz County, Yuma

16   County, and the City of Yuma's Application for Preliminary Injunction. (Doc. 9.) They

17   seek an injunction against Defendant United States Bureau of Reclamation's

18   ("Reclamation") approval of a partial assignment and transfer of a Colorado River water

19   entitlement held by GSC Farm, LLC ("GSC Farm") to the Town of Queen Creek ("Queen

20   Creek"). Plaintiffs' Application for Preliminary Injunction (Doc. 9) will be denied.

21   I.    **BACKGROUND**

22         A.    **Factual Background**[1]

23         GSC Farm is located in La Paz County. It holds a fourth priority Colorado River

24   water entitlement (the "Entitlement") to divert up to 2,913.3 acre-feet per year ("AFY") of

25   water for irrigation of its farmland located within the Cibola Valley Irrigation and Drainage

26

27   _____

     [1]  This factual background summary comes largely from Reclamation's Final
28   Environmental Assessment (Doc. 1-3), which neither party disputes.

District. (Doc. 23 at Ex. A.)[2]

Queen Creek is a municipality located within Maricopa and Pinal counties. It relies almost entirely on groundwater for its municipal water needs. In an effort to become less reliant on ground water, Queen Creek entered into a Purchase and Transfer Agreement for Mainstream Colorado River Water Entitlement (the "Proposed Water Transfer") with GSC Farm. (Doc. 1-3 at 10.) This Proposed Water Transfer would assign most of GSC Farm's Entitlement to Queen Creek, allowing it to divert 2,033.01 AFY from the Colorado River for consumptive use. (*Id.* at 11.) Queen Creek plans on having the water diverted at an existing diversion point at the Mark Wilmer Pumping Plant, through the Central Arizona Project system, to groundwater savings facilities where the water will be stored. (*Id.*) This would result in changing the point of diversion "from the [Cibola Valley Irrigation and Drainage District] . . . upstream approximately 88 river miles to the existing Mark Wilmer Pumping Plant, located near Parker Dam." (Doc. 23 at 12.)

Arizona law requires Queen Creek and GSC Farm to submit the Proposed Water Transfer to the Arizona Department of Water Resources ("ADWR"), and confer with its director, before the Transfer can proceed. Ariz. Rev. Stat. § 45-107(D). Initially, ADWR endorsed the Proposed Water Transfer, but only at 1,078.01 AFY of the Entitlement. (Doc. 23 at Ex. C.) ADWR later revised its position, recommending that GSC Farm could transfer 2,033.01 AFY to Queen Creek. (*Id.* at Ex. D.)

GSC Farm and Queen Creek next sought Reclamation's approval. Reclamation was asked to approve and execute the following four contracts, which would change the Entitlement's point of diversion, place of use, and type of use:

1.  The partial assignment and transfer of Arizona fourth priority Colorado River water entitlement between GSC Farm and Queen Creek;

---

[2] Of the 2,913.3 AFY that GSC Farm diverts for agricultural purposes, 830.29 AFY has historically returned to the Colorado River as return flow—meaning that GSC Farm's diversion of water only reduces flows in the Lower Colorado River by an average of 2,083.01 AFY. (Doc. 23-1 at 67.)

2.  A Colorado River water delivery contract between the United States and Queen Creek;

3.  An amendment to the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Arizona fourth priority Colorado River water entitlement; and

4.  An 8.17 Wheeling Contract with Queen Creek to wheel the transferred fourth priority Arizona Colorado River water entitlement to Queen Creek through the Central Arizona Project ("CAP") system.

(*Id.* at Exs. E–H.)

The process for reviewing these contracts is subject to the National Environmental Policy Act ("NEPA"), which requires Reclamation to analyze the potential environmental impacts of the Proposed Water Transfer. 42 U.S.C. §§ 4321 *et seq*. Under NEPA's procedures, Reclamation first scoped the Proposed Water Transfer and provided a period of time for public comment. 30 C.F.R. § 1500.1.[3] Next, Reclamation conducted an Environmental Assessment ("EA") to ascertain whether the Proposed Water Transfer would significantly impact the environment. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9. If Reclamation's EA determined that the Proposed Water Transfer constituted a "major Federal action significantly affecting the quality of the human environment," it was then required to prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(C) (alteration omitted). Conversely, if Reclamation found that the Proposed Water Transfer was not a major federal action significantly impacting the environment, Reclamation could issue a Finding of No Significant Impact ("FONSI"), which negates its obligation to move forward with an EIS. 40 C.F.R. § 1501.4(a).

In this instance, Reclamation scoped the Proposed Water Transfer by publishing

---

[3] As this case was commenced before NEPA's September 14, 2020, regulatory revisions became effective, the claim in this case arises under NEPA's 1978 regulations, as amended in 1986 and 2022. The Court therefore applies these previous versions of NEPA's regulations to this case. (Doc. 23 at 9 n.1); ( Doc. 1-3 at 8 n.1.)

notices in newspapers; websites; and direct mailing to 972 private citizens, nongovernmental organizations, public officials, and stakeholders. (Doc. 1-3 at 13.) In response to the public comments received, Reclamation prepared a draft EA. (Doc. 23 at 11.) Another period of public comment followed, during which representatives from La Paz County, Mohave County, and Yuma County objected to Reclamation approving the Proposed Water Transfer on the basis that the draft EA was inadequate and violated NEPA. (Doc. 1-3 at 83.) Reclamation then considered these objections and issued written responses. (*Id.* at 83–97.) Next, based on the public comments received during the scoping period, Reclamation conducted a final EA that analyzed the environmental impacts of three different alternatives. First, Reclamation considered a "No Action Alternative" where the Proposed Water Transfer would not be approved and GSC Farm would retain its Entitlement. (*Id.* at 17.) Second, Reclamation considered a "Proposed Action" alternative where the Proposed Water Transfer would be approved and GSC Farm would transfer its Entitlement to Queen Creek. (*Id.*) Finally, Reclamation analyzed an "Alternative Action" where the Proposed Water Transfer would be partially approved and GSC Farm would transfer only 1,078.01 AFY of its Entitlement. (*Id.* at 20.)

As to the Proposed Action, Reclamation considered the impact on biological resources, socioeconomic concerns, prime farmlands, and environmental justice.[4] Regarding biological resource impacts, Reclamation determined that the "only reduction in flow of diversion from the [Proposed Water Transfer] would occur between Parker Dam and the current [Cibola Valley Irrigation and Drainage District] point of diversion for the GSC Farm property." (*Id.* at 33.) As such, the Proposed Water Transfer would only impact roughly eighty-eight miles of the Colorado River. (*Id.* at 63–67.) Furthermore, for this eighty-eight mile stretch of the Colorado River, Reclamation determined that this portion of the River would only experience a monthly average reduction amounting to 0.045 to 0.053 percent. (*Id.*) Based on these findings, Reclamation concluded that the "cumulative

---

[4] Reclamation identified additional factors, but declined to analyze them as they were found to be "non-key issues" and inapplicable to the Proposed Water Transfer. (Doc. 1-3 at 15.)

impact of the [Proposed Water Transfer] . . . on biological resources would be minimal" and that "no discernible effect or change in the ecosystem functions supported by river flows are expected from implementation of the Proposed Action." (*Id.* at 34, 54.)

Reclamation further determined that the Proposed Water Transfer would not have "measurable impacts on habitat[s] that might be used by riparian or marsh special-status bird species[.]" (*Id.* at 34.) Reclamation's analysis relied on the Lower Colorado River Multi-Species Conservation Program ("LCR MSCP"), a biological assessment prepared by Reclamation and various other agencies in 2004 to facilitate wildlife conservation along the Lower Colorado River (Doc. 1-4 at 25.) The LCR MSCP detailed how "[d]iversion changes are expected to occur in response to shifts in water demand during the 50-year term of the LCR MSCP." (Doc. 23-1 at 265.) Such future changes in diversions over the course of these 50 years was covered in the amount of 1.574 million AFY. (*Id.*) Consequently, based on these calculations, Reclamation concluded that the Proposed Water Transfer would not significantly impact biological resources or wildlife habitats as the amount of diversions would fall within the amounts covered by the LCR MSCP:

> Diversions from the Colorado river in 2020 contributed to a net reduction in flow below the Parker Dam of 455,422 AFY on a consumptive use basis; these flow changes are accounted for and covered under the LCR MSCP's reduction in flow coverage of 1,574,000 AFY. The actions considered in this EA do not result in a reduction in the volume of flows below the Parker Dam beyond what was contemplated and is covered by the LCR MSCP.

(Doc. 1-3 at 54.)

As to socioeconomic impacts, Reclamation determined that the "direct and indirect . . . effects of the federal action are small compared to the economies of the regions evaluated." (*Id.* at 55.) There would not be a "discernible effect that would be considered a significant departure from the foreseeable future trends in Arizona's economy from selection of any of these alternatives." (*Id.* at 56.) In reaching this conclusion, Reclamation considered the future development of Queen Creek. Reclamation described how Queen

Creek's current planning projections account for the Town meeting its water demands through "groundwater, surface water, and reclaimed water sources." (*Id.* at 51.) And that none of the proposed actions would therefore "change the expected growth of [Queen Creek], nor would [they] change the economic outputs generated by [Queen Creek's] economy." (*Id.* at 56.) Lastly, Reclamation considered that under the Proposed Water Transfer GSC Farm would fallow 485 acres of land, but concluded that this would only result in losing two jobs, thus rendering the socioeconomic impacts de minimis. (*Id.* at 39–40.)

As to prime farmlands, Reclamation determined that GSC Farm holds approximately 479 acres of property La Paz County currently designates as prime farmlands. If the Proposed Water Transfer is approved, GSC Farm would either develop some of these lands for residential purposes or leave a portion of it fallowed, resulting in La Paz County losing approximately 0.4 percent of their prime farmlands. (Doc. 1-3 at 42.)

Regarding environmental justice, Reclamation found that the Proposed Water Transfer would not have adverse effects on public health and safety, cultural and historical resources, and Indian Trust Assets. (Doc. 1-2 at 5–6.) Moreover, "[t]he Proposed Action would not have a significant social or economic effect on Mohave, La Paz, or Yuma counties in Arizona or Riverside County in California" or "disproportionate high and adverse effects on low income or minority populations[.]" (*Id.*)

Finally, Reclamation conducted a cumulative impact analysis to assess "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. After conducting a cumulative impact analysis for each of the above factors, Reclamation concluded that the Proposed Water Transfer would not "have a significant effect on the human environment." (Doc. 1-2 at 6.) Based on this finding, Reclamation determined that it was unnecessary to prepare an EIS, and instead elected to prepare a FONSI. (*Id.*)

### B.      Procedural Background

Plaintiffs filed a Complaint and Application for Preliminary Injunction alleging that the Proposed Water Transfer constituted a major federal action that significantly impacted the environment, thus requiring Reclamation to conduct an EIS. (Docs. 1, 9.) The parties agreed to maintain the status quo until the earlier of April 28, 2023, or this Court's order on the Application for Preliminary Injunction, during which time Reclamation agreed not to execute the contracts required to effectuate the Proposed Water Transfer. (Doc. 43 at 2.)

Non-parties GSC Farm and Queen Creek each filed amici briefs opposing Plaintiffs' Application. (Docs. 25, 27.) Non-parties Mohave County Water Authority and the Mayors of the Cities of Lake Havasu City, Bullhead City, Kingman, San Luis, Somerton, and Yuma, and the Towns of Parker and Wellton (collectively, the "Mayors") filed a combined Amicus Brief in support of Plaintiffs' Application. (Doc. 29.) The Application is now fully briefed. (Docs. 9, 23, 31.) And the Court held oral argument on March 8, 2023. The administrative record is not yet prepared.

## II.     LEGAL STANDARDS

### A.      National Environmental Policy Act

NEPA requires federal agencies to prepare an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). Under NEPA's implementing regulations, a federal agency must prepare an EA. 42 U.S.C. §§ 4321 *et seq.* Based on those findings, the agency must either prepare an EIS or issue a FONSI. 42 U.S.C. § 4332(C); *City of Las Vegas v. F.A.A.*, 570 F.3d 1109, 1115 (9th Cir. 2009). If an agency issues a FONSI, it is excused from its obligation of preparing an EIS. 40 C.F.R. § 1501.4(a).

NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185. "NEPA is a

procedural statute," designed to ensure "that federal agencies take a 'hard look' at the environmental consequences of their proposed actions before deciding to proceed." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (quoting *Methow Valley*, 490 U.S. at 350–51)). "Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making." *Id.* (citing *Robertson*, 490 U.S. at 350). Moreover, "[a] court generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Id.* (quotation omitted).

## B.   Administrative Procedure Act

The Administrative Procedure Act ("APA") applies to Plaintiffs' NEPA claims. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> . . .
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and/or]
> (D) without observance of procedure required by law[.]

5 U.S.C. § 706(2).

When assessing claims pursuant to the APA, a court, reviewing only the administrative record, must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)). In other words, a court's "review is guided by whether the agency's analysis is reasonable and offers sufficient detail to ensure that environmental consequences have been fairly evaluated." *Protect Our Communities Found. v. Jewell*, 825

F.3d 571, 582 (9th Cir. 2016) (citation and quotations omitted).

A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Although a court's inquiry must be thorough, the standard of review is deferential; the agency's decision is "entitled to a presumption of regularity," and a court may not substitute its judgment for that of the agency. *Id.* at 415.

Courts should therefore defer to the agency on matters within the agency's expertise unless the agency failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (quotation omitted). As the Ninth Circuit explained in *River Runners*:

> In conducting an APA review, the court must determine whether the agency's decision is founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment. The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision.

*Id.* (internal citations and quotations omitted).

Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). Particularly, an agency's "scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded on other grounds by regulation as stated in Def. of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017).

### C.    Law of the River

The "Law of the River" refers to a collection of interstate compacts, federal treaties, statutes, regulations, and court decrees that were designed to "resolve disputes arising from water scarcity" and relate to Colorado River water rights. *Navajo Nation v. U.S. Dep't of the Interior*, 26 F.4th 794, 800 (9th Cir. 2022), *cert. granted sub nom. Arizona v. Navajo Nation*, 143 S. Ct. 398 (2022). The Secretary "is vested with considerable control over the apportionment of Colorado River waters," because she is "generally responsible for the management and delivery of water from the Colorado pursuant to the Law of the River . . . [e]ach state's water portion is dictated by the 1964 Decree, as is the allocation of surplus water; *Arizona v. California* accords discretion to the Secretary to apportion shortfalls in years of shortage[.]" *Navajo Nation v. U.S. Dep't of the Interior*, 876 F.3d 1144, 1156 (9th Cir. 2017) (citing *Arizona v. California*, 373 U.S. 546, 593–94 (1984)). "The 1964 Decree also commits the *determination* of surplus and shortage years to the Secretary." *Id.* (citing 1964 Decree art. II(B)(2)–(3)).

### D.    Preliminary Injunctive Relief

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for*

*the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. Regardless of which standard applies, the movant has "the burden of proof on each element of [the] test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

## III.   MOTION FOR PRELIMINARY INJUNCTION

### A.   Standing

The Court first considers whether Plaintiffs have standing to maintain this action. The "irreducible constitutional minimum of standing" consists of three components. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction must prove that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61)).

#### 1.   Injury in Fact

Plaintiffs allege that Reclamation violated the procedural rules of NEPA by issuing an inadequate EA that failed to fully analyze whether the Proposed Water Transfer was a major federal action that would significantly impact the environment. (Doc. 9 at 10.) "The nature of the Article III standing inquiry is not fundamentally changed by the fact that . . . [plaintiff] asserts a 'procedural,' rather than 'substantive,' injury." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). With that being said, to assert a procedural injury, Plaintiffs must allege that "(1) [Reclamation] violated certain procedural rules; (2) these rules protect [Plaintiffs'] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Id.* (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003) (alterations in

original).

As to the first factor, Plaintiffs allege that Reclamation violated NEPA's procedural rules by failing to take a hard look at the environmental impacts of the Proposed Water Transfer in the EA. (Doc. 9 at 15.) Typically, a "cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared under the National Environmental Policy Act[.]" *City of Sausalito*, 386 F.3d at 1197. Here, since Plaintiffs have alleged that Reclamation failed to conduct an EIS based on an inadequate EA, the Court finds that Plaintiffs have sufficiently alleged that Reclamation violated NEPA's procedural rules.

As to the second and third factors, Plaintiffs contend that NEPA's procedural rules were intended to protect their concrete interests and that Reclamation's failure to conduct an adequate EA will reasonably threaten these interests. As Plaintiffs are local government entities, they "may not simply assert the particularized injuries to the 'concrete interests' of its citizens on their behalf. Rather . . . [Plaintiffs] may sue to protect [their] own 'proprietary interests' that might be 'congruent' with those of its citizens." *Id.* (citations omitted). A local government's proprietary interests extend beyond protection of real and personal property to include its "responsibilities, powers, and assets." *Id.* Therefore, the Ninth Circuit has identified a local government's authority to enforce land-use, health and public safety regulations, the protection of its economy, natural resources, and aesthetic appeal from harm as cognizable proprietary interests. *Id.* at 1197–98. As Plaintiffs each assert different proprietary interests, the Court will separately analyze each Plaintiffs' interests, and then determine whether it is reasonably probable that the Proposed Water Transfer will threaten these interests.

### i.    Mohave County

Plaintiff Mohave County argues that Reclamation has found that "1.57 million [AFY] less Colorado River water will be flowing annually through Mohave County than previously estimated, and yet, Reclamation did not analyze the effects of the loss of river flow in conjunction with the Water Transfer or future transfers." (Doc. 9 at

16.) As a result, Plaintiffs allege that "Mohave County is unable to understand how this loss of water will impact Mohave's ability to manage and maintain its water resource and land use now or in the future." (*Id.* at 16–17.)

"Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quotation omitted). For this reason, the Court finds that Mohave County's allegation that the Proposed Water Transfer will threaten their ability to manage its future water and land use, without alleging how or to what extent this injury will impact the County, is too speculative and hypothetical to serve as a basis for standing. Therefore, the Court finds that Mohave County has failed to establish that it is reasonably probable that their concrete interests will be harmed by the Proposed Water Transfer, and that they have therefore failed to state a proper procedural injury as necessary for Article III standing.

### ii.       La Paz County

La Paz County asserts multiple proprietary interests impacted by the Proposed Water Transfer being approved. The Chairperson of La Paz County's Board of Supervisors, Holly Irwin, submitted a Declaration alleging that the "[Proposed Water Transfer] would affect the Plaintiffs' economic opportunities by diverting river water from agricultural use . . . to municipal use in urban areas." (Doc. 9-3 at 3.) La Paz County, however, does not specify what these economic harms are, but instead cites only to unspecified economic opportunities that may be lost should this transfer be allowed. Absent specific allegations of economic harm, the Court finds that La Paz County has not alleged a reasonable probability of their concrete interests being threatened.

La Paz County further alleges that the Proposed Water Transfer will "open the door for future water transfers to the metropolitan areas in Central Arizona at our expense." (*Id.*) And that the "[Proposed Water Transfer] would further exacerbate the 20-year megadrought that has caused the Colorado River to become the most endangered river in the United States[.]" (*Id.*) The Court finds that these claims are speculative and

hypothetical. To start, La Paz County does not explain how GSC Farm's transfer of its own water entitlement would reduce the County's water supply. Indeed, the parties agree that La Paz County does not have an actual interest in the water being transferred. (Doc. 31 at 6.) La Paz County therefore fails to allege a proprietary interest that would be adversely affected by a transfer that does not stem from an apparent right in GSC Farm's Entitlement.

Moreover, to the extent that La Paz County asserts standing based on the exacerbation of the ongoing drought, the Court finds this allegation is too hypothetical where La Paz County has failed to allege that any future water transfers have been proposed. For these reasons, the Court finds that La Paz County has failed to allege a concrete interest that is likely to be threatened as a result of Reclamation's approval of the Proposed Water Transfer. Thus, La Paz County lacks Article III standing.

### iii.    Yuma Plaintiffs

The City and County of Yuma assert that "as communities that rely on the Colorado River for drinking water," they will "be impacted by the reduced water flow and shallower water that will result in an increase of Total Dissolved Solid . . . levels, impacting drinking water quality." (Doc. 9 at 17.) The Yuma Plaintiffs also assert that "reduced river flows force the use of more groundwater in the region, which cannot be easily replaced, leading to potentially incompatible chemistry of groundwater that may result in reduced crop yields and food security." (*Id.*) Plaintiffs base these harms on Declarations submitted by John Simonton, City Administrator for the City of Yuma, and Jonathan Lines, incoming Vice-Chairman of the Yuma County Board of Supervisors. (Docs. 9-3, 9-4.) Notably, both parties indicated to the Court that "an evidentiary hearing [was] not necessary for deciding the Application for Preliminary Injunction[.]" (Doc. 37 at 2.) At oral argument, however, Plaintiffs stated that, had objections been made to the foundation of the Declarations, they would have asked for an evidentiary hearing. (Doc. 44 at 27.) On this record, the Court will not resolve the validity of the Declarations and their contents. For the purposes of this Order, then, the Court accepts the Declaration statements as true.[5]

---

[5] Defendants are not foreclosed from later challenging these Declarations. *United States v.*

Here, at this stage of the proceedings, it is sufficient that the Yuma Plaintiffs allege that if the Proposed Water Transfer is approved, the chemistry of their water will be disrupted. The Court thus finds that the Declarations allege harm in "sufficient detail to state a 'concrete and particularized injury'" to the Yuma Plaintiffs' proprietary interests in the management of their natural resources and related economic impacts. *City of Sausalito*, 386 F.3d at 1199 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 180). Moreover, the Yuma Plaintiffs have established that "it is reasonably probable that the challenged action will threaten their concrete interests," *id.* at 1197, and that the asserted injuries are "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc.*, 528 U.S. at 180; *see also California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 790 (9th Cir. 2014) ("For procedural rights, [the Court's] inquiry into the imminence of the threatened harm is less demanding . . . .") (quotation omitted). The Yuma Plaintiffs have sufficiently asserted a procedural injury for the purposes of establishing Article III standing.

## 2. Causation and Redressability

"Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001). Defendants do not challenge Plaintiffs' ability to establish causation and redressability, so the Court only briefly addresses them here. As for causation, the Yuma Plaintiffs' have established alleged injuries—negative impacts to drinking water, availability and quality, and groundwater reliance in Yuma—that are "fairly traceable" to Defendants' actions in approving the Proposed Water Transfer without an EIS. *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 600 (9th Cir. 2014). With respect to redressability, a plaintiff "who asserts inadequacy of a government agency's environmental studies under NEPA," like Plaintiffs do here, "need not show that further analysis by the government would result in a different conclusion." *Hall v. Norton*, 266 F.3d 969, 977 (9th

*Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997) ("[T]he jurisdictional issue of standing can be raised at any time[.]").

Cir. 2001). Instead, it is enough that a favorable decision from this Court enjoining the Proposed Water Transfer would likely remedy Plaintiffs' alleged injuries. *City of Sausalito*, 386 F.3d at 1199. The Court finds that Plaintiffs have shown causation, and that a ruling in favor of Plaintiffs would redress these alleged injuries.

### B.    Standing Under the Administrative Procedure Act

Even if Plaintiffs have standing under Article III, Plaintiffs must additionally show that they have standing under the APA; that their asserted procedural injury is "within the zone of interests that [NEPA] was designed to protect." *Douglas County. v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir. 1995). In making this determination, the Court looks to whether "(1) [Plaintiffs'] interests are inconsistent with the purposes of NEPA, and that (2) the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit." *Id.* at 1500. The "purpose of NEPA is to protect the environment, not economic interests. Therefore, a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Id.* at 1499 (cleaned up). Here, Defendants do not appear to challenge that Plaintiffs' alleged injuries are within the zone of interests NEPA was designed to protect. The Court does find, however, that to the extent the Yuma Plaintiffs allege economic harms as a result of Reclamation's failure to conduct an adequate EA, that these harms are outside of NEPA's zone of interests, and that the Yuma Plaintiffs lack standing under the APA to pursue these claims. (Doc. 9-3 at 3.) With that being said, the Yuma Plaintiffs have alleged environmental harms—namely the impact of the Proposed Water Transfer on the availability and quality of drinking water—sufficient to establish standing under the APA.

For these reasons, the Court finds that the Yuma Plaintiffs have established both Article III standing and standing under the APA. Moreover, the Court "need only conclude that one of the plaintiffs has standing in order to consider the merits of the plaintiffs' claim." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1014 (9th Cir. 2013). As such, the Court turns to the merits of Plaintiffs' NEPA claim.

### C.    Likelihood of Success on the Merits[6]

Plaintiffs have asserted four different arguments as to why Reclamation's EA violated NEPA and the APA. First, Plaintiffs argue that Reclamation failed to adequately consider the cumulative impacts of the Proposed Water Transfer as to the effects of climate change and the ongoing drought. Second, Plaintiffs argue that Reclamation failed to adequately consider the cumulative impacts of the Proposed Water Transfer by relying on the 2004 LCR MSCP. Third, Plaintiffs argue that Reclamation failed to consider the cumulative impacts of the Proposed Water Transfer by choosing not to analyze the Transfer's precedent-setting nature. Finally, Plaintiffs argue that Reclamation failed to adequately analyze the impact that the Proposed Water Transfer will have on the future growth of Queen Creek. The Court will address each of Plaintiffs' arguments in turn.

### 1.    The cumulative impacts of climate change and the ongoing drought on the Colorado River

Under NEPA, Reclamation must conduct a cumulative impact analysis to determine the impact on the environment resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (quotations and alterations omitted). Therefore, a cumulative impact analysis "must be more than perfunctory; it must provide a useful

---

[6] The Court considers the arguments made by GSC Farm and Queen Creek in their amici briefs with Reclamation's arguments in opposition of the Application for Preliminary Injunction. (Docs. 25, 27.) The Court also considers the arguments made by the Mayors in their amici brief with Plaintiffs' arguments in support of the Application for Preliminary Injunction. (Doc. 29.) That being said, the Court will not "address issues raised only in [the] amicus brief[s]." *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003).

1  analysis of the cumulative impacts of past, present, and future projects." *Id.* at 994

2  (quotation omitted).

3  Reclamation argues that it was not required to address the cumulative impacts of

4  climate change and the ongoing drought, as those events are not "past, present, or future

5  projects" capable of being undertaken by the agency. *See* 40 C.F.R. § 1508.7. Instead,

6  Reclamation contends that climate change and the ongoing draught are external events

7  outside the agency's control. (Doc. 23 at 27) (quoting *Klamath-Siskiyou Wildlands*, 387

8  F.3d at 994). The Court agrees with Reclamation's assessment. As the Ninth Circuit has

9  noted, "[w]hen environmental plaintiffs challenge an EIS's cumulative . . . effects analysis,

10 they usually contend that the EIS failed to consider the environmental effects of the project

11 at issue in conjunction with the environmental effects of other past, present, and reasonably

12 foreseeable future projects." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88

13 F.3d 754, 763–64 (9th Cir. 1996) (quotation omitted). In this case, Plaintiffs do not specify

14 any particular action or project that Reclamation failed to consider, but instead assert a

15 blanket requirement that Reclamation needed to consider the external effects of climate

16 change and the ongoing drought. "NEPA does not require the government to do the

17 impractical." *Id.* at 764. But that is exactly what Plaintiffs ask Reclamation to do by

18 conducting an analysis of complex and amorphous issues outside the scope of 40 C.F.R.

19 § 1508.7.

20 Despite not being required to conduct a cumulative impact analysis of climate

21 change and the ongoing drought, however, Reclamation included a brief analysis of these

22 factors in the EA. Reclamation considered the fact that "[w]ith climate change impacting

23 drought conditions, water could become increasingly scarce, especially when designated

24 for wildlife benefit versus human development." (Doc. 1-3 at 54.) Reclamation determined

25 that this could occur under "*any* of the alternatives considered in this EA." (*Id.* at 53.) But

26 because the Proposed Water Transfer would only result in minor flow reductions for one

27 stretch of the Lower Colorado River, the "cumulative impact of the Proposed Action . . . on

28 biological resources would be minimal." (*Id.* at 54.)

In sum, even if Reclamation was required to consider the cumulative impacts of climate change and the ongoing drought, Reclamation's EA took a hard look at these factors to the extent that they were applicable to the Proposed Water Transfer. The Court therefore finds that Reclamation took the necessary hard look required under NEPA. For this reason, the Court concludes that Plaintiffs are unlikely to succeed on the merits of their claim that Reclamation violated NEPA by failing to analyze the cumulative impacts of climate change and the ongoing drought.

## 2.    Reclamation's reliance on the LCR MSCP

Second, Plaintiffs argue that Reclamation improperly relied on the 2004 LCR MSCP to conclude that the Proposed Water Transfer would not have a significant environmental impact. (Doc. 9 at 22.) Plaintiffs contend that the LCR MSCP, dating back to 2004, is obsolete, and that its analysis lacks appreciation for the current drought conditions. Reclamation claims that Plaintiffs misinterpret the LCR MSCP findings. (Doc. 23 at 29.) "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Furthermore, an agency's "scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv*., 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded by regulation as stated in All. for the Wild Rockies v. Savage*, 783 F. App'x 756 (9th Cir. 2019). This is especially true when an agency makes predictions "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

Relevant to this case, the LCR MSCP was a biological assessment conducted by Reclamation, in conjunction with various agencies, pursuant to the Endangered Species Act ("ESA") for the purpose of ensuring the conservation of wildlife and wildlife habitats along the Lower Colorado River. (Doc. 1-4 at 25.) The LCR MSCP notes that "[d]iversion changes are expected to occur in response to shifts in water demand during the 50-year term of the LCR MSCP." (Doc. 23-1 at 265.) And covered diversion changes during the

course of its fifty-year term on the Lower Colorado River in the amount of 1.574 million AFY. (*Id.*) Relying on this coverage, Reclamation concluded that the Proposed Water Transfer would not significantly impact the environment as the expected reductions from the Proposed Water Transfer would fall well below the range anticipated by the LCR MSCP:

> Diversions from the Colorado River in 2020 contributed to a net reduction in flow below Parker Dam of 455,422 AF[Y] on a consumptive use basis; these flow changes are accounted for and covered under the LCR MSCP's reduction in flow coverage of 1,574,000 AFY. The actions considered in this EA do not result in a reduction in the volume of flows below Parker Dam beyond what was contemplated and is covered by the LCR MSCP.

(Doc. 1-3 at 54.)

Plaintiffs raise multiple arguments as to why Reclamation erred in relying on the LCR MSCP's findings. First, they argue that the LCR MSCP budgeted a "worst case" scenario where water shortages in the Colorado River would amount to 341,000 AFY, and that 2022's reduction in river flow equaling 713,000 AFY has already doubled this amount. (Doc. 9 at 23.) Reclamation maintains that this conclusion is not supported by any data within the LCR MSCP, and that Plaintiffs erroneously reached this number by tallying the total flow reductions in the three combined lower basin states.[7]

The Court agrees with Reclamation. Plaintiffs have failed to show that the LCR MSCP's findings are inapplicable to the Proposed Water Transfer, and that it was therefore unreasonable for Reclamation to rely on the LCR MSCP's calculations. Moreover, the Court is "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697

---

[7] Reclamation maintains that Plaintiffs reached this number by adding the estimated reductions from changes in points of diversion for Arizona (200,000 AFY), California (800,000 AFY), and Nevada (233,000 AFY) to reach 1.233 million AFY, and that Plaintiffs then subtracted this amount from the LCR MSCP's 1.574 million AFY coverage to reach a worst case scenario for shortages of 341,000 AFY. (Doc. 23 at 30 n.16.)

1    F.3d 1043, 1051 (9th Cir. 2012) (quotation omitted). Plaintiffs' have thus failed to show

2    that the LCR MSCP's calculations are erroneous and not entitled to judicial deference.

3          Second, Plaintiffs contend that Reclamation failed to address how much of the 1.57

4    million AFY the LCR MSCP provided coverage for has been used, and argue that the 1.57

5    million AFY has already been surpassed. (Doc. 9 at 24.) Plaintiffs find support for this

6    argument on the fact that "just based on the 2022 water shortage of 713,000 AFY and the

7    water commitment mentioned in Reach 4 on Table 10 of 455,422 AFY, the total

8    commitment [of] water is 1,168,422 AFY—already 405,578 AFY in excess of the 1.57

9    MAFY that Reclamation relies on to justify its decision to proceed on the basis of an EA."

10   (*Id.*) Reclamation again maintains that Plaintiffs' argument is founded on dubious

11   calculations found nowhere within the LCR MSCP. Specifically, Reclamation argues that

12   Plaintiffs erroneously reached their figure of 713,000 AFY by adding projections from the

13   Lower Basin Drought Contingency Plan Agreement for a Tier 1 year.[8] But that nothing in

14   the LCR MSCP itself supports Plaintiffs' reliance on these figures. The Court agrees with

15   Reclamation, and finds that Plaintiffs have failed to show that the LCR MSCP's coverage

16   of 1.57 million AFY has been surpassed, or will be surpassed, as a result of the Proposed

17   Water Transfer being approved. Furthermore, Plaintiffs have failed to show that the LCR

18   MSCP's calculations are erroneous and should be replaced with the figures from the Lower

19   Basin Drought Contingency Plan.

20         Finally, Plaintiffs argue that Reclamation recently reinitiated consultation under

21   Section 7 of the ESA to reassess the 1.57 million AFY reduction of river flow covered for

22   by the LCR MSCP, but that Reclamation failed to include this analysis in the EA (Doc. 9

23   at 24.) Reclamation concedes that it reinitiated consultation under Section 7 and did not

24   include this analysis in the EA, but contends that it was only for the purpose of assessing

25

26   [8] The Lower Basin Drought Contingency Plan is a 2019 agreement that the United States
     and various agencies entered into to address the storage of water in Lake Mead.
27   Reclamation maintains that Plaintiffs used the Plan's projected reductions in water for
     Arizona (512,000 AFY), Nevada (21,000 AFY), Mexico (80,000 AFY), and Reclamation
28   (100,000 AFY) to reach a total reduction of 713,000 AFY. (Doc. 23 at 30 n.17.)

the reduction of flows in Reaches 2 and 3—and not Reaches 4 and 5, where the Proposed Water Transfer is impacted:[9]

> Reclamation initiated Section 7 ESA consultation with the Fish and Wildlife service to seek additional reduction in flow coverage for reaches 2 and 3 *only*. Reach 2 and 3 are from Hoover Dam to Parker Dam. The proposed action would result in a minor reduction in flow in reach 4, below Parker Dam, where Reclamation already has 1.57 million acre-feet in reduction in flow coverage under the ESA.

(Doc. 1-3 at 89) (emphasis added).

Because Reclamation's consultation under Section 7 of the ESA does not impact the amount of coverage provided for by the LCR MSCP in relation to the Proposed Water Transfer, the Court finds that this was not a factor that Reclamation needed to analyze in the EA.

In sum, the Court finds that Reclamation reasonably relied on the LCR MSCP in concluding that the Proposed Water Transfer would "not result in a reduction in the volume of flows below Parker Dam beyond what was contemplated and is covered by the LCR MSCP." (*Id.* at 54.) Reclamation's reliance on the LCR MSCP was not arbitrary and capricious, and the Court finds that Plaintiffs are unlikely to succeed on the merits of this legal theory.

### 3.     The precedent set by the Proposed Water Transfer

Third, Plaintiffs argue that the Proposed Water Transfer will set a precedent, as well as provide a blueprint, for future water transfers along the Colorado River. (Doc. 9 at 25.) Specifically, Plaintiffs contend that this will be the first time water from the Colorado River will be transferred to the interior of Arizona for consumptive use. As such, Plaintiffs argue that Reclamation was required to conduct a cumulative impact analysis for future water transfers that could reasonably be anticipated as a result of this approval. (*Id.*) NEPA

---

[9] The LCR MSCP divides the Lower Colorado River into seven "reaches," or river segments. (Doc. 1-3 at 33 n.14.) Relevant here, Reach 2 and 3 are from Hoover Dam to Parker Dam, Reach 4 extends from Parker Dam to Cibola Gage, and Reach 5 is bounded by Cibola Gage and Imperial Dam. (*Id.*)

requires that Reclamation conduct a cumulative impact analysis for any "reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. The Ninth Circuit has defined "'reasonably foreseeable' in this context to include only 'proposed actions.'" *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir. 2005).

Here, Plaintiffs argue that a cumulative impact analysis was required because "the same hedge fund behind this Water Transfer has already purchased thousands of acres of property along the Colorado River, along with the tens of thousands of appurtenant water rights[.]" (Doc. 9 at 25.) Reclamation declined to analyze the potential of these future water transfers being approved, explaining that no plans for such transfers are currently pending, and that any analysis of such transfers would therefore be speculative:

> While Arizona fourth priority Colorado River water entitlement holders may intend to sell some portion of their water entitlements to unknown entities at some point in the future, at present Reclamation is not aware of any other proposed transfers. Any such proposals would initially need to be evaluated by ADWR . . . . Accordingly, potential future transfers of Arizona fourth priority Colorado River water are too speculative to bet [sic] considered.

(Doc. 1-3 at 91.)

Plaintiffs rely on *Wildearth Guardians v. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 888 (D. Mont. 2020), for the assertion that Reclamation was required to conduct an analysis of "hypothetical situations that represented the spectrum of foreseeable results." *Id.* But *Wildearth* is distinguishable from this case, as the "hypothetical situations" that the court mentioned there were contracts that were currently pending at the projects' leasing stage. *Id.* at 889. Here, no comparable situation exists. Moreover, the Ninth Circuit has routinely held that an "agency is required to analyze the cumulative effects of projects that it is already proposing. For any project that is not yet proposed, and is more remote in time, however, a cumulative effects analysis would be both speculative and premature." *Lands Council*, 395 F.3d at 1023; *see also Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1000 (9th Cir. 2013) (holding that a cumulative impact analysis was not required when the

proposed plans were "speculative and have not been reduced to specific proposals"). Such a conclusion makes sense as each future transfer, if any, would be subject to review by ADWR, as mandated by Arizona law, as well as require Reclamation to conduct a separate and individualized EA.

Because there are currently no plans for any additional water transfers in the record, speculating about potential future transfers does not provide a reason for compelling a cumulative impact analysis by Reclamation. For this reason, the Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that Reclamation violated NEPA by failing to consider the cumulative impacts of future water transfers.

### 4. The effect of the Proposed Water Transfer on Queen Creek's future growth

Finally, Plaintiffs argue that Queen Creek's future growth was a factor that Reclamation failed to consider in analyzing the cumulative impacts of the Proposed Water Transfer. (Doc. 9 at 29.) Under 40 C.F.R. § 1508.7, Reclamation must consider the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" *Id.* Here, Reclamation did not analyze Queen Creek's future growth, reasoning that doing so was outside the scope of the EA because this growth would occur regardless of whether the Proposed Water Transfer was approved:

> Queen Creek's projected development and water demand include development of the land within its jurisdiction, which is scheduled to occur even without the proposed water transfer. It would be speculative for Reclamation to project what additional growth, beyond build-out, could eventually be approved by Queen Creek that this proposed water transfer could support as an assured water supply. Development of Queen Creek is a matter of state and local jurisdiction. Future development activities in Queen Creek are not induced by nor do they rely on the water to be transferred; therefore, any future development activities that might use this water are outside of the scope of federal action considered in this EA.

(Doc. 1-3 at 12–13.)

Plaintiffs contend that Queen Creek's future growth is a reasonably foreseeable

action that Reclamation must analyze, and that not doing so is arbitrary and capricious. The Court disagrees. "[T]he absence of a more thorough discussion in an Environmental Impact Statement of an issue that was sufficiently analyzed in referenced state materials does not violate the National Environmental Policy Act." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1163 (9th Cir. 1997) (citing *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 526 n.6 (9th Cir. 1994)). Here, Reclamation relied on Queen Creek's already approved planning documents to reach the conclusion that the Town's growth would occur regardless of whether the Proposed Water Transfer was approved:

> Queen Creek's growth through build-out has been accounted for and analyzed by Queen Creek's planning documents. The water transfer is proposed not to induce growth, but rather to allow Queen Creek to diversify its water portfolio for already existing and projected growth that is occurring independently of the water transfer.

(Doc. 1-3 at 51.) Thus, Queen Creek's growth is not a future action necessitating Reclamation to conduct an in-depth analysis in the EA.

Second, requiring Reclamation to analyze Queen Creek's future growth would run afoul of NEPA's rule of reason, which requires the Court to make "a pragmatic judgment whether the [EA's] form, content, and preparation foster both informed decision-making and informed public participation." *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019) (quotation omitted). The Supreme Court has held that "[i]t would not, therefore, satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform." *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004). Put another way, the rule of reason is not violated when the agency "has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions[.]" *Id.* at 770. Here, Reclamation lacks authority to influence Queen Creek's already-existing development plans. It would therefore violate NEPA's rule of reason to require Reclamation to conduct an EIS predicated on actions it has no ability to prevent.

The Court finds that Queen Creek will continue growing regardless of whether the Proposed Water Transfer is approved, and that this future growth is not an indirect effect under NEPA. Moreover, requiring Reclamation to analyze this growth would violate NEPA's rule of reason. For these reasons, the Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that Reclamation violated NEPA by failing to analyze the cumulative impacts of Queen Creek's future growth.

In conclusion, the Court finds that Plaintiffs are not entitled to a preliminary injunction because they are not likely to succeed on the merits of their claim that Reclamation violated NEPA and the APA.

### D.     Irreparable Harm

To obtain preliminary relief, Plaintiffs must show that they are likely to suffer irreparable harm in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Plaintiffs need not show "that the action sought to be enjoined is the exclusive cause of the injury." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quotation omitted). But "[t]here must be a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined, and showing that the requested injunction would forestall the irreparable harm qualifies as such a connection." (*Id.*) (quotations omitted).

First, Plaintiffs argue that the "[Proposed] Water Transfer could further exacerbate the 20-year megadrought that has caused the Colorado River to become the most endangered river in the United States, causing irreparable harm to the environment and Plaintiffs' interests in that environment." (Doc. 9 at 32.) The Court finds Plaintiffs' argument unpersuasive. To start, Plaintiffs do not dispute that the ongoing drought will continue regardless of whether the Proposed Water Transfer is approved. (Doc. 31 at 6.) While it is true that "the action sought to be enjoined [need not be] the exclusive cause of the injury[,]" *Nat'l Wildlife Fed'n*, 886 F.3d at 819, Plaintiffs have failed to demonstrate

that Reclamation's approval of the Proposed Water Transfer will cause an immediate worsening of the ongoing drought. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). In fact, Plaintiffs have not explained how the diversion of 2,033 AFY along an eighty-eight mile stretch of the Colorado River will worsen the current drought when this water is already being taken out of the River for agricultural use, especially when considering that this eighty-eight mile stretch will only experience additional monthly average reductions in flows of approximately 0.045 to 0.053 percent. (Doc. 1-3 at 33.)

Second, Plaintiffs argue that "removal of this water from the Colorado River Community, where a common economic activity is farming, would be synonymous with removal of employment and other economic activities in the area." (Doc. 9 at 33.) This assertion is plainly contradicted by the facts in the record. Reclamation analyzed the socioeconomic impacts of the Proposed Water Transfer in-depth and concluded that "as a worst-case scenario . . . two direct workers would lose their jobs because of the [Proposed Water Transfer.]" (Doc. 1-3 at 39.) For this reason, Reclamation concluded that there would be no "discernible effect that would be considered a significant departure from the foreseeable future trends in Arizona's economy from selection of any of these alternatives." (*Id.* at 56.) And that the Proposed Water Transfer would therefore have a de minimis impact on employment within the Colorado River Community. In the face of these findings by Reclamation, the Court finds that there is no support in the record for Plaintiffs' assertion that the Proposed Water Transfer would significantly impact the economy of the Colorado River Communities. Thus, Plaintiffs have failed to show that they are likely to suffer irreparable harm as a result of these alleged economic impacts.

Finally, Plaintiffs argue that "without a preliminary injunction, Reclamation's approval of the [Proposed] Water Transfer without an EIS will undercut the Court's ability to render meaningful relief, since, the water will be diverted to Queen Creek once approvals are granted." (Doc. 9 at 34.) As noted by amicus Queen Creek, however, "[t]he same 2,033 AFY will be consumptively used each year regardless of whether an injunction issues. It does not injure Plaintiffs if, during the pendency of the dispute, the water is stored and used

by Queen Creek instead of being consumed to farm alfalfa or cotton by GSC Farm." (Doc. 27 at 26.) Moreover, Plaintiffs have not shown that it would be impractical for the Court to stop future water transfers to Queen Creek, and to have the status quo restored by ordering the parties to redivert the water to its original state.

For these reasons, the Court finds that Plaintiffs have failed to show that they are likely to suffer irreparable harm as a result of the Court denying Plaintiff's Application for Preliminary Injunction.

### E.      Balance of Hardships and the Public Interest

Plaintiffs are not entitled to a preliminary injunction because they have not satisfied the first two *Winter* factors. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 651 (9th Cir. 2021) ("[B]ecause plaintiffs have not demonstrated a likelihood of success on any claim, we need not address the other preliminary injunction factors that plaintiffs also would have needed to establish."). Nonetheless, the Court will analyze whether the balance of hardships and the public interest weigh in Plaintiffs' favor. That being said, "[w]hen the government is a party, [the balance of hardships and the public interest] factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Furthermore, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citation omitted). The Court therefore addresses the balance of hardships and the public interest in turn.

As to the balance of hardships, Plaintiffs argue that the "financial or other harm Reclamation can claim . . . would be greatly outweighed by the permanent and irreversible harm to Plaintiffs and the environment if the [Proposed] Water Transfer were to proceed based on the FONSI and inadequate Final EA." (Doc. 9 at 35.) For its part, Reclamation concedes that "at this time, Reclamation experiences no particularized harm for delaying the execution of the transfer documents, primarily because the water can continue to be

1    lawfully beneficially used, under an existing and valid contract, within river operational

2    parameters." (Doc. 23 at 40 n.20.) In the face of this admission, the Court finds that the

3    balance of hardships indisputably tips in the favor of Plaintiffs.

4            As to the public interest, Plaintiffs argue that the "public . . . has a strong interest in

5    ensuring that federal agencies comply with laws designed to protect the public waters and

6    lands, as well as public participation." (Doc. 9 at 37.) The Ninth Circuit has held that the

7    "preservation of our environment, as required by NEPA . . . is clearly in the public interest."

8    *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006), *abrogated on*

9    *other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). On the other

10   hand, Queen Creek contends that they will be harmed by an injunction as they "would not

11   receive the benefit [of the Proposed Water Transfer]" and the "water would be consumed

12   by GSC Farm and could never be recovered." (Doc. 27 at 27.) Therefore, an injunction

13   "harms Queen Creek through increased costs, increased reliance on groundwater, and the

14   permanent loss of the water that should be transferred but is prevented from being

15   transferred." (*Id.*) For its part, GSC Farm argues that it will be harmed as Plaintiffs are

16   "interfering with a lawful transaction involving the transfer of a private water entitlement

17   that was anticipated by the terms of GSC Farm's contract[.]" (Doc. 25 at 29.)

18           On balance, while it is certainly in the public interest for Reclamation to follow the

19   procedural rules of NEPA, the Court is aware that ADWR and Reclamation have already

20   recommended and approved the Proposed Water Transfer, and all that remains is executing

21   the contracts. For this reason, the issuance of an injunction would delay the execution of

22   the Proposed Water Transfer and impose significant expectancy costs on Queen Creek and

23   GSC Farm. Balancing these competing interests, the Court finds that the public interest

24   weighs neither in favor for, nor against, the issuance of a preliminary injunction.

25           In sum, although the Court finds that the balance of hardships favor Plaintiffs, they

26   do not tip sharply in their favor. Moreover, as Plaintiffs have not shown that an injunction

27   is in the public interest, or that they are likely to suffer irreparable harm, the Court need

28   not determine whether there are "serious questions going to the merits" of Plaintiffs' NEPA

claim. *Greenpeace*, 709 F.3d at 1291.

**IV.     CONCLUSION**

The Court finds that only the Yuma Plaintiffs have standing under Article III and the APA. Plaintiffs, however, are unlikely to succeed on the merits of their claim that Reclamation violated NEPA and the APA. The Court further finds that Plaintiffs are not likely to suffer irreparable harm as a result of the Proposed Water Transfer being approved.

Accordingly,

**IT IS ORDERED denying** Plaintiffs' Application for Preliminary Injunction (Doc. 9).

**IT IS FURTHER ORDERED** lifting the stay of Defendant's answer deadline. (Doc. 41.)

Dated this 6th day of April, 2023.

Michael T. Liburdi
United States District Judge