**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

County of Mohave, et al.,

Plaintiffs,

v.

United States Bureau of Reclamation, et al.,

Defendants.

No. CV-22-08246-PCT-MTL

**ORDER**

This case concerns a transfer of an Arizona fourth-priority Colorado River water entitlement from GSC Farm, LLC, an on-the-river farm located in La Paz County, to the Town of Queen Creek ("Queen Creek"), miles away in Maricopa and Pinal Counties. (Doc. 1; Administrative Record ("AR") Doc. 106 at 6642.)

Plaintiffs Mohave County, La Paz County, Yuma County, and the City of Yuma (collectively "Plaintiffs") filed an Application for a Preliminary Injunction against Defendants United States Bureau of Reclamation, the Commissioner of the Bureau of Reclamation, and the Regional Director, Interior Region 8: Lower Colorado Basin of the Bureau of Reclamation (collectively "Reclamation"). (Doc. 9.) The Court denied the Application for Preliminary Injunction on April 6, 2023. (Doc. 49.)

Pending now before the Court are Plaintiffs' Motion to Supplement the Administrative Record (Doc 62) and the parties' Cross-Motions for Summary Judgment (Docs. 63, 65). The Court held Oral Argument on January 11, 2024. With the benefit of

1  the entire administrative record now before it, the Court grants Plaintiffs' Motion for
2  Summary Judgment (Doc. 63), denies Plaintiffs' Motion to Supplement the Administrative
3  Record (Doc. 62), and denies Reclamation's Motion for Summary Judgement (Doc. 65).

4  **I.    BACKGROUND**

5          The Court explained many of the key facts in the Order denying the Application for
6  Preliminary Injunction ("PI Order"). (Doc. 49.) Rather than repeat them, the Court briefly
7  discusses some background facts and details the key facts within the analysis of the
8  motions.

9          In December 2018, GSC Farm, LLC entered into a Purchase and Transfer
10 Agreement for Mainstream Colorado River Entitlement ("Water Transfer") with the Town
11 of Queen Creek. (AR Doc. 106 at 6644.) The Water Transfer assigns GSC Farm's fourth-
12 priority Colorado River water entitlement ("Entitlement"), allowing GSC Farm to divert
13 up to 2,913.3 acre-feet per year ("AFY") from the Colorado River for consumptive use.
14 (*Id.* at 6644, 6709.) The Water Transfer would be diverted from the mainstream at the Mark
15 Wilmer Pumping Plant, through the Central Arizona Project system, to groundwater
16 savings facilities where the water will be stored. (*Id.* at 6653.) This results in changing the
17 point of diversion "from the [Cibola Valley Irrigation and Drainage District] . . . upstream
18 approximately 88 river miles to the existing Mark Wilmer Pumping Plant, located near
19 Parker Dam." (*Id.* at 6644.)

20         As required under A.R.S. § 45-107(D), GSC Farm and Queen Creek submitted to
21 the Arizona Department of Water Resources ("ADWR") "a request for consultation for the
22 proposed Water Transfer." (AR Doc. 33 at 4541.) ADWR initially recommended diverting
23 only 1,078.01 AFY, but later revised its position to 2,033.01 AFY. (*Id.* at 4548; AR Doc.
24 43 at 5149.)

25         GSC Farm and Queen Creek then sought Reclamation's approval and execution of
26 four contracts that would change the Entitlement's point of diversion, place of use, and
27 type of use:

28              1. The partial assignment and transfer of Arizona fourth
                priority Colorado River water entitlement between GSC Farm

and Queen Creek;

2. A Colorado River water delivery contract between the United States and Queen Creek;

3. An amendment to the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Arizona fourth priority Colorado River water entitlement; and

4. An 8.17 Wheeling Contract with Queen Creek to wheel the transferred fourth priority Arizona Colorado River water entitlement to Queen Creek through the Central Arizona Project ("CAP") system.

(AR Doc. 106 at 6645; AR Docs. 112, 113, 114, 115.)

Reclamation reviewed these contracts following the procedures outlined in the National Environmental Policy Act ("NEPA"). (AR Doc. 106 at 6642.) Reclamation collected public comments by notice as preparation for an environmental assessment ("EA"). (*Id.* at 6646-49, 6709-11.) Reclamation then prepared and published a draft EA on its website. (*Id.* at 6648-49.) After considering the public comments, Reclamation prepared and issued a final EA in July 2022. (*See* AR. Doc. 106.) After issuing the EA, Reclamation prepared a Finding of No Significant Impact ("FONSI"). (AR Doc. 108.) Based on its findings, Reclamation explained that it found the Water Transfer "will not have a significant effect on the human environment. Therefore, an environmental impact statement is not warranted." (*Id.* at 6738.)

As a result, Plaintiffs filed a Complaint and Application for Preliminary Injunction alleging that the Water Transfer constituted a major federal action that significantly impacted the environment requiring Reclamation to conduct an environmental impact statement ("EIS"). (Docs. 1, 9.) The Court denied Plaintiffs' Application for Preliminary Injunction on April 6, 2023. (Doc. 49.)

The Court received the certified administrative record in June 2023. (Doc. 57.) Shortly thereafter, in July 2023, Plaintiffs filed a Motion to Supplement the Administrative Record and Motion for Summary Judgment. (Docs. 62, 63.) Reclamation also filed its Cross-Motion for Summary Judgment. (Doc. 65.) Non-party the Town of Queen Creek filed an amicus brief (Doc. 70) opposing Plaintiffs' motion, while non-party the State of

1   Arizona filed an amicus brief (Doc. 71) supporting Plaintiffs' motion.[1]

2       The motions are fully briefed, and the Court held oral argument.

3   **II.   SUMMARY JUDGMENT STANDARD**

4       In reviewing motions for summary judgment under the Administrative Procedures
5   Act ("APA"), "the Court's function 'is to determine whether or not as a matter of law the
6   evidence in the administrative record permitted the agency to make the decision it did.'"
7   *Kirk v. Off. of Navajo & Hopi Indian Relocation*, 426 F. Supp. 3d 623, 628 (D. Ariz. 2019)
8   (quoting *Occidental Eng'g Co. v INS*, 753 F.2d 766, 769 (9th Cir. 1985)). As such, "[t]he
9   agency, not the Court, is the fact-finder," and "summary judgment is the appropriate
10  mechanism for deciding the legal question of whether the agency could reasonably have
11  found the facts as it did." *Id.*; *see also Burnside v. Off. of Navajo*, No. CV-15-08233-PCT-
12  PGR, 2017 WL 4284576, at *7 (D. Ariz. Sept. 27, 2017) ("In the APA context, summary
13  judgment is the mechanism through which the reviewing court determines as a matter of
14  law whether the evidence in the administrative record reasonably permitted the agency to
15  make the decision it did.").

16      Summary judgment is appropriate if the evidence, viewed in the light most favorable
17  to the nonmoving party, demonstrates "that there is no genuine dispute as to any material
18  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A
19  genuine issue of material fact exists if "the evidence is such that a reasonable jury could
20  return a verdict for the nonmoving party," and material facts are those "that might affect
21  the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477
22  U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant
23  is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255
24  (internal citations omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127,
25  1131 (9th Cir. 1994) (holding that the court determines whether there is a genuine issue for
26  trial but does not weigh the evidence or determine the truth of matters asserted).

27
28  ---
[1] The Court considers the arguments made by amici but will not "address issues raised only in [the] amicus brief[s]." *See Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 719 n10. (9th Cir. 2003).

1     When, as here, "parties submit cross-motions for summary judgment, each motion

2  must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v.*

3  *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations

4  omitted). The summary judgment standard operates differently depending on whether the

5  moving party has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

6  (1986). As the party with the burden of proof, Plaintiffs "must establish beyond controversy

7  every essential element" of their claims based on the undisputed material facts. *S. Cal. Gas*

8  *Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). Reclamation, by contrast, must

9  merely establish that Plaintiffs cannot make a prima facie case in consideration of the

10 undisputed material facts. *See Celotex*, 447 U.S. at 322-23.

11 **III.   DISCUSSION**

12     **A.     Standing**

13     The Court first addresses whether Plaintiffs have standing to maintain this action.

14 Reclamation argues that Plaintiffs lack standing because "they fail to show that the [Water]

15 Transfer causes them a cognizable, actual, and imminent injury." (Doc. 65 at 19.) The

16 following must be shown to establish Article III standing:

17          (1) [Plaintiff] has suffered an 'injury in fact' that is (a) concrete
           and particularized and (b) actual or imminent, not conjectural
18         or hypothetical;
           (2) the injury is fairly traceable to the challenged action of the
19         defendant; and
           (3) it is likely, as opposed to merely speculative, that the injury
20         will be redressed by a favorable decision.

21

22 *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

23     For an alleged procedural injury, like here, the "inquiry into the imminence of the

24 threatened harm is less demanding" and "the causation and redressability requirements are

25 relaxed." *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the*

26 *Interior*, 767 F.3d 781, 790 (9th Cir. 2014). "A plaintiff alleging procedural harm can

27 demonstrate injury in fact by showing (i) the agency violated certain procedural rules,

28 (ii) those rules protect a concrete interest of the plaintiff, and (iii) it is reasonably probable

that the challenged action threatens that concrete interest. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017) (citations omitted). At the summary judgment stage, the plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

Furthermore, Plaintiffs must show that they have standing under the APA; that their asserted procedural injury is "within the zone of interests NEPA was designed to protect." *Douglas County. v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995). In making this determination, the Court looks to whether "(1) [Plaintiffs'] interests are inconsistent with the purposes of NEPA, and that (2) the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit." *Id.* at 1500. The "purpose of NEPA is to protect the environment, not economic interests." *Id.* at 1499.

### 1.     Injury in Fact

Plaintiffs argue that they have suffered an injury in fact because (i) Reclamation violated NEPA's procedural rules, (ii) those rules protect Plaintiffs' concrete interests, and (iii) it is "'reasonably probable' that Reclamation's approval of the Water Transfer threatens that concrete interest." (Doc. 72 at 11 (quoting *Navajo Nation*, 876 F.3d at 1160).)

Regarding municipalities, such as Plaintiffs, the Ninth Circuit has "recognized that a municipality has an interest in, inter alia, its ability to enforce land-use and health regulations, its powers of revenue collection and taxation, in protecting its natural resources from harm, and where land management practices of federal land could affect adjacent [municipality]-owned land." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (citations omitted).

### i.     Mohave County

Reclamation argues that Mohave County asserts the same injuries as those raised in the Application for a Preliminary Injunction and that the Court correctly found the County's reasons too speculative and too hypothetical. (Doc. 65.) The Court agrees.

Mohave County alleges that the loss of water will impact its ability to manage and

maintain its water and land use now and in the future. "Allegations of possible future injury do not satisfy the requirements of [Article III]. A threatened injury must be certainly impending to constitute an injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990) (cleaned up). The only new evidence presented is the resume of Declarant Travis Lingenfelter, (Doc. 72-4), but Mohave County does not provide any specific examples of how the Water Transfer threatens their ability to manage future water and land use. Mohave County, moreover, does not present any additional evidence of injury than what it provided at the preliminary injunction stage. Therefore, the Court finds Mohave County lacks Article III standing.

### ii.      La Paz County

Similarly, with respect to La Paz County, Reclamation argues it raises the same injuries as those advanced in the Application for a Preliminary Injunction and that the Court correctly found the County's reasons too speculative and too hypothetical. (Doc. 65.) The Court agrees.

La Paz County asserts multiple proprietary interests impacted by the Water Transfer. The Chair of La Paz County's Board of Supervisors, Holly Irwin, submitted a Declaration alleging that the "[Water Transfer] would affect the Plaintiffs' economic opportunities by diverting river water from agricultural use . . . to municipal use in urban areas." (Doc. 72-3 at 3.) La Paz County, however, does not specify what these economic harms are, but instead cites only to unspecified economic opportunities that may be lost should this transfer proceed. Given that La Paz County alleges only an economic harm, the Court finds that it has not alleged a reasonable probability of their concrete interests being threatened. *See Douglas County*, 48 F.3d at 1499 ("[A] plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA.").

La Paz County further alleges that the Water Transfer will "open the door for future water transfers to the metropolitan areas in Central Arizona at [its] expense." (Doc. 72-3 at 3.) And that the "[Water Transfer] would further exacerbate the 20-year megadrought that has caused the Colorado River to become the most endangered river in the United States[.]"

1    (*Id.* at 4.) The Court finds that these claims are speculative and hypothetical. Therefore, the

2    Court finds La Paz County lacks Article III standing.

3                        **iii.    Yuma Plaintiffs**

4            With respect to Plaintiffs the City of Yuma and Yuma County, Reclamation argues

5    that "neither Declarant has an adequate factual foundation for statements as to the alleged

6    impacts to the Yuma Plaintiffs' water supplies" to establish standing. (Doc. 65 at 19-20.)

7    Plaintiffs respond by providing supplemental declarations they say demonstrate an injury

8    in fact. (Doc. 72 at 11; Docs. 72-1, 72-2.) Specifically, the Yuma Plaintiffs rely on the

9    Colorado River as their only source of water, and the Water Transfer will reduce flow;

10   thus, altering the Colorado River's water chemistry. (Doc. 72 at 14.) Reclamation replies

11   that Plaintiffs did not meet their burden because Reclamation found in the EA that water

12   flow would not be affected. (Doc. 76 at 8.)

13           The Yuma Plaintiffs assert that they rely on the Colorado River for drinking water

14   and will be impacted by the reduced water flow and shallower water conditions in the river

15   that will result in an increase of total dissolved solid levels, impacting drinking water

16   quality. (Doc. 72 at 15.) The Yuma Plaintiffs also assert that reduced river flows force the

17   use of more groundwater in the region, which cannot be easily replaced, leading to

18   potentially incompatible chemistry of groundwater that may result in reduced crop yields

19   and food security. (*Id.* at 14.) Plaintiffs base these harms on supplemental declarations

20   submitted by John Simonton, City Administrator for the City of Yuma, and Jonathan Lines,

21   incoming Vice-Chairman of the Yuma County Board of Supervisors. (Docs. 72-1, 72-2.)

22   Mr. Simonton's professional experience includes capital improvements project manager

23   and director of utilities for the City, both roles which required him to understand water and

24   wastewater management for the City. (Doc. 72-1.) Mr. Lines does not clearly outline his

25   experience or expertise in water management, but his declaration explains his personal

26   knowledge comes from his experience as the Yuma County District 2 Supervisor and Vice

27   Chair of the Water Infrastructure Finance Authority of Arizona. (Doc. 72-2.)

28           Here, the Yuma Plaintiffs allege that the Water Transfer will affect the quality and

chemistry of their water. The Court therefore finds that the declarations allege harm in "sufficient detail to state a concrete and particularized injury" to the Yuma Plaintiffs' proprietary interests in the management of their natural resources. *City of Sausalito*, 386 F.3d at 1199. Moreover, the Yuma Plaintiffs have established that "it is reasonably probable that the challenged action will threaten their concrete interests." *Id.* at 1197. The asserted injuries also are "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc.*, 528 U.S. at 180; *see also California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 790 (9th Cir. 2014) ("For procedural rights, [the Court's] inquiry into the imminence of the threatened harm is less demanding . . . .") (cleaned up). The Yuma Plaintiffs have sufficiently asserted a procedural injury for the purposes of establishing Article III standing.

### 2.      Causation and Redressability

"Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001). Reclamation argues that Plaintiffs alleged harms based on reduced water flow and shallow water are factually insufficient and do not provide evidence that the Water Transfer will cause these harms. (Doc. 65 at 22.) The Court disagrees.

As for causation, the Yuma Plaintiffs have established alleged injuries—negative impacts to drinking water, availability and quality, and groundwater reliance in Yuma—that are "fairly traceable" to Reclamation's actions in approving the Water Transfer without an EIS. *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 600 (9th Cir. 2014). With respect to redressability, a plaintiff "who asserts inadequacy of a government agency's environmental studies under NEPA," like Plaintiffs do here, "need not show that further analysis by the government would result in a different conclusion." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). Instead, it is enough that a favorable decision from this Court would likely remedy Plaintiffs' alleged injuries. *City of Sausalito*, 386 F.3d at 1199.

The Court therefore finds that Plaintiffs have shown causation, and that a ruling in favor of Plaintiffs would redress these alleged injuries.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.     Motion to Supplement the Administrative Record

Plaintiffs move to supplement the administrative record with a webpage titled "Phoenix AMA Groundwater Supply Updates" from July 18, 2023 (hereinafter "Phoenix AMA Webpage"). (Doc. 62 at 2.) Plaintiffs argue that supplementation is necessary "to determine whether the agency has considered all factors and explained its decision"; "the agency relied on documents not in the record"; and the Phoenix AMA Webpage "is needed to explain technical terms or complex subjects." (*Id.* at 4-5 (citing factors from *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)).) Plaintiffs claim that Reclamation indirectly relied on the Phoenix AMA Webpage because the "Lower Colorado River Basin 500+ Plan" information sheet (AR Doc. 71) includes information about the 500+ Plan, a plan to conserve at least 500,000 AFY to benefit Lake Mead, and a link to the ADWR website for 500+ Plan updates. (Doc. 62 at 6-7.) Reclamation argues that the Phoenix AMA Webpage includes "post-decisional information" that postdates Reclamation's EA by nearly a year. (Doc. 64 at 5-6.) Furthermore, Reclamation claims that it did not rely on the Phoenix AMA Webpage and that the webpage does not explain any technical terms or complex subjects. (*Id.* at 7.)

The APA requires a court to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *see also Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) ("Generally, judicial review of agency action is limited to review of the administrative record."). The administrative record "consists of all documents and materials directly or indirectly considered by the agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Department of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted). Courts expand the administrative record in only four "narrowly construed circumstances: (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the

agency."[2] *Fence Creek Cattle Co.*, 602 F.3d at 1131. Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (citation omitted). An agency is entitled to a presumption that it properly designated the administrative record. *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017), *vacated on other grounds*, 583 U.S. 29 (2017).

The Phoenix AMA Webpage offers information about the groundwater condition in the Phoenix Active Management Area and states that "the Phoenix AMA will experience 4.86 million acre-feet (maf) of unmet demand for groundwater supplies, given current conditions." (Doc. 62-1 at 2.) The Phoenix AMA Webpage also provides "the State will not approve new determinations of Assured Water Supply within the Phoenix AMA based on groundwater supplies." (*Id.*) The modeling for this webpage was publicly released on June 2, 2023. (Doc. 64-1 at 2.)

Plaintiffs claim that Reclamation should have collected this "critical data that may have prevented Reclamation's speculation of potential effects of the Water Transfer." (Doc. 62 at 6.) This data, however, was not available until June 2023, nearly a year after Reclamation completed its EA in July 2022. (Doc. 57-2 at 3; Doc. 64-1 at 2.) *See Tri-Valley CAREs v. U.S. Dept. of Energy*, 671 F.3d 1113, 1130-31 (9th Cir. 2012) ("[P]ost-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision because it inevitably leads the reviewing court to substitute its judgment for that of the agency." (cleaned up)).

Furthermore, Reclamation did not "directly or indirectly" consider the Phoenix AMA Webpage. *See Thompson*, 885 F.2d at 555. The information sheet does include information about the 500+ Plan, and Reclamation also includes information about the 500+ Plan in its EA. (AR Doc. 71 at 6055-6065; AR Doc. 106 at 6084, 6088.) It also contains a link to ADWR's homepage (new.azwater.gov) and states that "[a]dditional updates will be made as the 500+ Plan is developed. Last Update: Nov. 17, 2021." (AR

---

[2] Plaintiffs do not argue "bad faith on the part of the agency." *See Fence Creek Cattle Co.*, 602 F.3d at 1131. The Court therefore does not address this factor.

Doc. 71 at 6056.) The URL for the Phoenix AMA Webpage, however, is not the main ADWR homepage, but instead https://new.azwater.gov/phoenix-ama-groundwater-supply-updates. (Doc. 62-1 at 2.) The EA does not indicate that Reclamation relied on ADWR's entire website to make supplementing the record with the Phoenix AMA Webpage warranted.

Finally, the Phoenix AMA Webpage does not seem to provide "technical terms" or explain "complex subjects." *See Fence Creek Cattle Co.*, 602 F.3d at 1131. Plaintiffs do not "identify which basic concepts or issues relevant to their motion cannot be understood through consideration of the administrative record alone." *See Ctr. for Biological Diversity v. Skalski*, 61 F. Supp. 3d 945, 952 (E.D. Cal. 2014) (denying motion to supplement administrative record). The webpage is only six paragraphs, and it summarizes the unmet water demand in the Phoenix AMA and how the State plans to address this. (Doc. 62-1 at 2.) It is written in a manner for the public to understand and simply provides a general update. (*See id.*) *Cf. Bold All. v. U.S. Dep't of the Interior*, 572 F. Supp. 3d 943, 948 (D. Mont. 2020) (granting motion to supplement administrative record when report provided context for a coating study including "explain[ing] types of coatings, how different types of coating interact with each other as well as other corrosion control measures, and how sunlight and other types of weathering can degrade coatings").

Accordingly, the Court denies Plaintiffs' Motion to Supplement the Administrative Record (Doc. 62).

### C.    Cross-Motions for Summary Judgment

#### 1.    Parties' Arguments

Plaintiffs argue that Reclamation acted arbitrarily and capriciously by relying on an inadequate EA and failing to prepare an EIS. (Doc. 63 at 14.) Plaintiffs contend that Reclamation failed to properly consider the "significance" of the project, citing to four factors under 40 C.F.R. § 1508.27(b) (2019).[3] (Doc. 63 at 15-16.) Plaintiffs specifically

---

[3] Reclamation received the project recommendation before the regulation amendments became effective on September 14, 2020, and as a result, completed its review applying the regulations in existence before the 2020 regulations went into effect. (A.R. at 6642 n.1.) The Court applies the regulations in force at the time before the amendments. *See 350*

argue Reclamation improperly analyzed the following: (1) "the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration"; (2) "whether the action is related to other actions with individual insignificant but cumulatively significant impacts"; (3) "degree to which the effects on the quality of the human environment are likely to be highly controversial"; and (4) "the degree to which the possible effects on the human environment are highly uncertain or involve unique and unknown risks" (Doc. 63 at 16, 19, 21, 24 (quoting 40 C.F.R. § 1508(27)(b)(4)-(7)).) Plaintiffs also argue Reclamation's cumulative impact analysis did not properly consider the context of the ongoing megadrought and that Reclamation also unreasonably relied on the 2004 Lower Colorado River Multi-Species Conservation Program ("LCR MSCP"). (Doc. 63 at 26-30.)

In its Motion, Reclamation argues that Plaintiffs misapply the "significance" factors and do not demonstrate substantial questions that the Water Transfer may have a significant effect on the environment. (Doc. 65 at 23-32.) Reclamation also argues Plaintiffs' position regarding the drought and LCR MSCP are identical to those arguments made previously, which the Court rejected in the PI Order. (Doc. 65 at 33-35.)

## 2.    Analysis

The APA's procedure for judicial review, 5 U.S.C. §§ 701–06, applies to Plaintiffs' NEPA claims. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

When assessing claims pursuant to the APA, a court, reviewing only the administrative record, must determine "whether or not as a matter of law the evidence in

*Montana v. Haaland*, 50 F.4th 1254, 1270 n.23 (9th Cir. 2022).

the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co.*, 753 F.2d at 769-70). A court's "review is guided by whether the agency's analysis is reasonable and offers sufficient detail to ensure that environmental consequences have been fairly evaluated." *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (citation and quotations omitted).

NEPA requires federal agencies to prepare an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). Under NEPA's implementing regulations, a federal agency must prepare an EA. Based on the EA, the agency must either prepare an EIS or issue a FONSI. *See City of Las Vegas, Nev. v. FAA*, 570 F.3d 1109, 1115 (9th Cir. 2009). If an agency issues a FONSI, it is excused from its obligation of preparing an EIS. *Id.*

NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185. "NEPA is a procedural statute," designed to ensure "that federal agencies take a 'hard look' at the environmental consequences of their proposed actions before deciding to proceed." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (quoting *Methow Valley*, 490 U.S. at 350-51). "Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making." *Id.* (citing *Methow Valley*, 490 U.S. at 350). Moreover, "[a] court generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Id.* (cleaned up).

An agency's decision to issue a FONSI rather than conduct an EIS can be set aside if the plaintiff shows the decision was arbitrary and capricious. *Bair v. California Dep't of Transp.*, 982 F.3d 569, 577 (9th Cir. 2020). To determine this, courts review "whether the

agency has taken a hard look at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 123, 1239 (9th Cir. 2005)). An agency must prepare an EIS "[i]f there is a substantial question whether an action 'may have a significant effect' on the environment." *Ctr. for Biological Diversity*, 538 F.3d at 1185 (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1209, 1212 (9th Cir. 1998)); *see also* 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1502.1, 1508.18, 1508.27. "[A] plaintiff does not need to show that the significant effects will in fact occur" but whether "a substantial question" exists that an action "*may* have a significant effect." *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (emphasis added) (citation omitted). Plaintiffs therefore only need to show that an important question exists about whether an action has the possibility of having a significant effect. *See Substantial*, Black's Law Dictionary (11 ed. 2019) (defining "substantial" in part as "[i]mportant, essential, and material; of real worth and importance <a substantial right>"); *May*, Black's Law Dictionary (11th ed. 2019) (defining "may" in part as "[t]o be a possibility <we may win on appeal>").

Whether an action may "significantly affect" the environment requires consideration of "context" and "intensity." 40 C.F.R § 1508.27(a)-(b). Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity "refers to the severity of impact." *Id.* § 1508.27(b). Officials should consider ten factors when evaluating intensity. *Id.* These ten factors include the four identified by Plaintiffs. *See id.* The Ninth Circuit has held that meeting just one of these factors may be sufficient to require preparation of an EIS. *Ocean Advocates v. U.S. Army Corp of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

### i.      Precedent for Future Actions

Plaintiffs argue that an EIS was required "because of the precedential nature of the decision to allow the first-ever transfer of mainstream Colorado River water off the river

1    to support urban growth." (Doc. 63 at 16.) Further, Plaintiffs contend that Reclamation
2    "conflat[ed] the requirement to consider precedent-setting potential with the requirement
3    to include 'reasonably foreseeable future actions' in its cumulative effects analysis." (*Id.*)
4    Plaintiffs also argue the "EA is completely devoid of analysis by Reclamation of the
5    potential for the Water Transfer to establish a precedent for future actions, other than
6    Reclamation's perfunctory responses to comments." (*Id.* at 17.)

7         Reclamation argues that Ninth Circuit law explains "EAs are usually highly specific
8    to the project and the locale, thus creating no binding precedent." (Doc. 65 at 24 (quoting
9    *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*,
10   751 F.3d 1054, 1072 (9th Cir. 2014)).) Reclamation contends that "to have precedential
11   effect under § 1508.27, the proposed action must 'create binding precedent.'" (*Id.*)

12        Under 40 C.F.R. § 1508.27(b)(6), an agency should consider "[t]he degree to which
13   the action may establish a precedent for future actions with significant effects or represents
14   a decision in principle about a future consideration." *Id.* § 1508.27(b)(6). "If approval of a
15   single action will establish a precedent for other actions which may cumulatively have a
16   negative impact on the environment, an EIS may be required." *Anderson v. Evans*, 371
17   F.3d 475, 493 (9th Cir. 2004).

18        Plaintiffs and the State of Arizona identify a case outside of the preliminary
19   injunction briefing that provides analogous facts and better supports their precedential
20   effects argument, *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812 (E.D.
21   Mich. 2008). (Doc. 63 at 18-19; Doc. 71 at 8; *see also* Docs. 9, 31.) In *Anglers*, the plaintiffs
22   argued that the Forest Service failed to consider whether an exploratory drilling project
23   may establish a precedent for future actions under 40 C.F.R. § 1508.27(b)(6). *Anglers*, 565
24   F. Supp. 2d at 824, 832. Savoy, a private company, held three federal and three state
25   subsurface mineral leases. *Id.* at 817. Savoy filed an application to drill a gas well into one
26   of its lease holdings. *Id.* The Forest Service knew of three potential exploratory drilling
27   projects that would be evaluated separately on a case-by-case basis. *Id.* at 831-32. There,
28   the district court found that the exploratory drilling project may establish a precedent for

future actions with significant effects because the Forest Service knew that Savoy may perform three additional drilling projects even though they were not yet applied for or specifically proposed. *Id.* The district court also reasoned that the Forest Service knew the project was not unique, that future wells would need EAs for approval, and the Forest Service did not assess "the extent to which approving the current proposal could affect those future actions." *Id.* at 832.

Reclamation found that potential future water transfers were too speculative to be considered and concluded that these would be reviewed "on a case-by-case basis." (AR Doc. 106 at 6718.) Although Reclamation concluded that each water transfer would be evaluated independently, this does not mean that this transaction has no precedential effect. A precedential effect need not be binding to support the need for an EIS. *See WildEarth Guardians v. Provencio*, 923 F.3d 655, 674-75 (9th Cir. 2019) (concluding where the administrative record contains evidence that that the agency would defer to a neighboring national forest's policy for motorized big game retrieval as a non-binding "minor precedential effect" that alone was insufficient to require preparation for an EIS).

Like the Forest Service in *Anglers*, however, Reclamation received comments that Greenstone, which holds GSC Farms water delivery contract, "owns approximately 6,000 acres of land along the Colorado River that it intends to market in the future." (AR Doc. 106 at 6725 (Comment 4-10); *see also id.* at 6726 ("Greenstone (GSC Farm's parent company) and other related entities reportedly own around 6,600 acres in Yuma County alone, and this does not include the acres owned by other similar water marketing entities").) These 6,000 acres are not part of the Water Transfer at issue here. (*Id.*) Reclamation acknowledges these comments but concludes they are too speculative to consider:

> Reasonably foreseeable future actions include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision. These federal and nonfederal activities that must be taken into account in the analysis of cumulative impact

include, but are not limited to, activities for which there are existing decisions, funding, or proposals identified by the bureau. *Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite.* 43 CFR § 46.30.

While Arizona fourth priority Colorado River water entitlement holders may intend to sell some portion of their water entitlements to unknown entities at some point in the future, at present Reclamation is not aware of any other proposed transfers. Any such proposals would initially need to be evaluated by ADWR, as explained in Section 1.2.1 of the EA. *Accordingly, potential future transfers of Arizona fourth priority Colorado River water are too speculative to bet [sic] considered.* Please also refer to the response to comment 2-3.

(*Id.* at 6725 (emphasis added) (response to Comment 4-10).)

*Proposed future water transfers are possible.* Any proposed future water transfers of Arizona fourth priority Colorado River water through the Central Arizona Project would be reviewed on a case-by-case basis. The legal/regulatory authorization for our consideration of the Proposed Action and the action alternative identified in our EA are outlined in Section 1.2.1 of this EA. This transfer is being evaluated in accordance with applicable federal law, contract terms and procedures, and established policy and practice, including, an evaluation of the potential effects of the action to the human environment in accordance with the requirements of NEPA and other applicable environmental regulation.

(*Id.* at 6718 (emphasis added) (response to Comment 2-3).)

"Reasonably foreseeable future actions," however, are those that affect the cumulative impact, not necessarily the precedent for future actions. *See* 43 C.F.R. § 46.30 (defining "reasonably foreseeable future actions" as those to be considered for the "cumulative impact" analysis); 40 C.F.R. § 1508.7 (defining "cumulative impact"); *Id.* § 1508.27(b)(6)-(7) (defining "precedent for future actions with significant effects" and "cumulatively significant impacts" as two *different* factors to consider); *see also Anglers*, 565 F. Supp. 2d at 831 ("Here, the analysis of the project's cumulative impact was not contested beyond an improper segmentation claim that fails because the Forest Service is

not currently considering any other proposed projects, even if further development is reasonably foreseeable. However, the outcome of this project likely sets a precedent for future drilling in the region, an effect that was not considered in the EA.").

The regulation requires Reclamation to consider "*the degree* of which the action *may* establish a precedent," meaning Reclamation should have provided some explanation as to the scope or size of the potential precedential effect. 40 C.F.R. § 1508.27(b)(6) (emphasis added); *see also Degree*, Merriam-Webster, https://www.merriam-webster.com/dictionary/degree (last visited Feb. 7, 2024) (defining "degree" in part as "the extent, measure, or scope of an action, condition, or relation"). Instead, Reclamation claimed that future water transfers may happen, but they were too speculative to be considered. This, however, "runs counter to the evidence before the agency" *See O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm.*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Plaintiffs identify for the first time to this Court a document in the administrative record that shows that Queen Creek purchased the Water Transfer from GSC Farms for $10,000 per transferable acre-feet, or $20,880,000 in total. (AR. Doc. 24 at 4356, 4361.) Reclamation had the purchase price of the Water Transfer and information that Greenstone may market an additional 6,000 acres of farmland for other transfers within the administrative record. With this concrete information, it is unreasonable that Reclamation would conclude that considering future water transfers is "too speculative." *See Solar Energy Industries Ass'n v. FERC*, 80 F.4th 956, 995 (9th Cir. 2023) ("Because at least some degree of 'speculation . . . is implicit in NEPA,' agencies may not 'shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry.'" (citation omitted)).

Plaintiffs therefore raise a "substantial question" that the Water Transfer "may have a significant effect on the environment." *See Ctr. for Biological Diversity*, 538 F.3d at 1185 (cleaned up). *Compare Hausrath v. United States Dep't of Air Force*, 491 F. Supp. 3d 770, 803-804 (D. Idaho 2020) (finding the plaintiff raised "substantial questions with respect to

the precedential nature of this action" when the matter was "poised to be a template" for other installations even though the action created no "binding precedent"), *with Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998) (reasoning that the proposed project was "a unique, independent project" that did not "establish any precedent" and that the plaintiff had "not shown that any similar or related projects are being contemplated" to establish precedent). This therefore "supports the conclusion that an EIS is necessary—but the precedential factor alone is not dispositive." *See WildEarth Guardians*, 923 F.3d at 674-75 (cleaned up).

### ii.    Cumulatively Significant Impacts

Plaintiffs argue that Reclamation did not "consider the relationship between the Water Transfer and Queen Creek's future growth, which may have individually insignificant but cumulatively significant impacts." (Doc. 63 at 19.) Plaintiffs also argue that Reclamation was required to "independently evaluate" information provided by Queen Creek and GSC Farm under 40 C.F.R. § 1506.5. (*Id.*) Reclamation argues that Plaintiffs misapply the "cumulatively significant impacts" analysis and that they do not "identify any other specific cumulative impact Reclamation failed to consider." (Doc. 65 at 27.) Reclamation also argues that Plaintiffs did not raise this issue during the administrative process, thereby "waiv[ing] any such contention" that Reclamation needed to address other specific efforts or projects by Queen Creek to satisfy water needs. (*Id.*) Reclamation further argues that the Court already rejected a similar argument in the PI Order. (*Id.* at 28.)

As an initial matter, Plaintiffs did not waive this cumulative effect argument because they did raise the issue as it relates to Queen Creek's growth in the administrative process. The Court points to comments submitted by the Mohave County Board of Supervisors on the draft EA. (*See* AR Doc. 106 at 6721 (providing Reclamation dismissed the need for the water to support future growth needs of Queen Creek).)

An agency should consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R.

§ 1508.27(b)(7). The regulations define cumulative impact on the environment as "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." *Id.* § 1508.7. Under 43 C.F.R. § 46.30,

> Reasonably foreseeable future actions include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision. These federal and non-federal activities that must be taken into account in the analysis of cumulative impact include, but are not limited to, activities for which there are existing decisions, funding, or proposals identified by the bureau. Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite.

*Id.*

In the EA, Reclamation found that Queen Creek "is able to meet projected demand at build-out with existing water supplies," and that "it is not reasonably foreseeable that the proposed water transfer will itself induce growth." (AR Doc. 106 at 6685.) In response to Plaintiffs' comments regarding the Water Transfer inducing growth in Queen Creek, Reclamation stated:

> Growth Inducing Effects (including urbanization and sprawl). Reclamation has taken a hard look at the Queen Creek use plans, policies, and objectives. *Queen Creek has projected its future development and water needs, and it is able to meet projected demands at build-out with existing water supplies*, as discussed in EA Section 1.4 and 3.3. The fourth priority Arizona Colorado River water being proposed for transfer is not identified or approved as an assured water supply to support a particular development or could support additional growth beyond the projected build-out. Further, Queen Creek's projected development and water demand include development of the land within its jurisdiction, which is scheduled to occur even without the proposed water transfer. It would be speculative for Reclamation to try to project what additional growth, beyond build-out, could eventually be approved by Queen Creek that this proposed water transfer could support as an assured water supply. Development of Queen Creek is a matter of state and local jurisdiction. Please

see Response to Comment 4-2 for additional information.

(*Id.* at 6720 (emphasis added) (response to Comment 4-1).)

> The Arizona fourth priority Colorado River water would be *used by Queen Creek to off-set use of current groundwater supplies that have been determined by ADWR to be adequate to support future planned growth* in the Queen Creek water service area. The proposed transfer of GSC Farm's Arizona fourth priority Colorado River water entitlement is not reasonably expected to cause Queen Creek to grow in excess of its already planned growth *that is being fully supported by its assured water supplies*.
>
> Queen Creek *has legal access to groundwater supplies needed to support its current demand and anticipated future planned development* within Queen Creek's water service area. (Queen Creek et al. 2017).

(*Id.* at 6721 (emphasis added) (response to Comment 4-2).)

Reclamation argues that its conclusions in the EA are supported by Queen Creek's Water System Master Plan Update 2017, (AR. Doc. 21), and the 2018 General Plan, (AR. Doc 22 (plan approved May 15, 2018)). (Doc. 65 at 28.) These documents corroborate Reclamation's determination that Queen Creek's growth does not depend on the Water Transfer. (*See* AR Doc. 22 at 4304 ("the Town is able to meet water demands when the Planning Area is a build-out"); *id* at 4308 ("[t]he Town is able to meet the anticipated build-out water demands using groundwater, surface water, and reclaimed water resources"; AR Doc. 21 at 4187-92 (explaining meeting water requirements at build-out).)

Plaintiffs, however, identify in the administrative record a memorandum from Queen Creek's town manager and finance and utility services department directors stating that Queen Creek may rely on the Water Transfer to support future growth. (AR Doc. 24.) The memorandum provides that Queen Creek plans to "minimize its reliance on the Central Arizona Groundwater Replenishment District (CAGRD) to meet the groundwater replenishment requirements." (*Id.* at 4358.) The memorandum further explains "[f]actoring in projected growth rates, excess groundwater delivered will result in a 10, 15, and 20 year cumulative deficit of 93,000, 154,000, and 223,000 acre-feet respectively." (*Id.* at 4359.)

The Water Transfer "would address over 10% of the anticipated water resource shortage at buildout." (*Id.* at 4360.) The memorandum, dated December 17, 2018, postdates the Water System Master Update 2017 and the 2018 General Plan. (*See id.* at 4358.)

Under the regulations, "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). A "cumulatively significant impact is an impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." *Hausrath*, 491 F. Supp. 3d at 796-97 (finding an EA's cumulatively significant impact analysis that relied on flaw data as "a conclusory determination that there will be no significant cumulative effect upon the ambient noise environment").

Based on the data from the memorandum identified by Plaintiffs, it is reasonably foreseeable that the Water Transfer will facilitate growth. *See* 40 C.F.R. § 1508.8(b) ("Indirect effects, which are caused by the action and are later in time or farther removed in distance, but as still reasonably foreseeable. Indirect effects may include growth inducting effects . . . . Effects and impacts as used in these regulations are synonymous."). More importantly, given the water shortage at build-out, it is reasonably foreseeable that Queen Creek may try to acquire additional surface water to fulfill its needs. *See Klamath-Siskiou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996-97 (9th Cir. 2004) (concluding a lack of cumulative impact analysis in part when EA did not address "potential for a combined effect from the combined runoffs"); *Ocean Advocates*, 402 F.3d at 868-70 (concluding a lack of cumulative impact analysis in part when EA "found that increased vessel traffic would occur . . . regardless" and "not assessing the cumulative effects of multiple projects" and not including "quantified or detailed information"). Reclamation could have factored this information into its analysis rather than concluding the growth and impact are too speculative. (*See* AR Doc. 106 at 6725.) In fact, Queen Creek provided data within its memorandum to support its analysis, meaning that Reclamation could have factored this in too. *See Kern*, 284 F.3d at 1075 ("Consideration of cumulative

impacts requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." (cleaned up)).

As such, this factor weighs in favor of Reclamation conducting an EIS because Plaintiffs raise a "substantial question" that the Water Transfer's cumulatively significant impact may have a significant effect on the environment. *See Ctr. for Biological Diversity*, 538 F.3d at 1185.

### iii.    Highly Controversial

Plaintiffs argue that Reclamation failed to consider the intensity factor of "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." (Doc. 63 at 20-25.) Reclamation argues that the Water Transfer is not "highly controversial" as applied under the regulation. (Doc. 65 at 29.)

Under 40 C.F.R. § 1508.27(b)(4), an agency should consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." "Controversial" refers to disputes over "the environmental consequences of the proposed action and does not refer to the existence of opposition to a proposed action." 43 C.F.R. § 46.30; *see also Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017) ("Controversial refers to disputes over the size or effect of the action itself, not whether or how passionately people oppose it."). A project is only "highly controversial" if there is a "substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *WildEarth Guardians*, 923 F.3d at 673 (citation omitted).

Plaintiffs support the argument that the Water Transfer is highly controversial by identifying a letter in the administrative record from ADWR to Reclamation. (Doc. 63 at 22-24; AR Doc. 33.) In that letter, ADWR cites another letter from 1990 from the then-ADWR Director to the then-Interior Secretary regarding Colorado River allocations in Arizona. (AR Doc. 33 at 4545.) According to ADWR, the letter "impliedly reserved the entire 164,652 [AFY] for mainstem use" but that letter "was nonbinding." (*Id.* at 4545-46.)

Plaintiffs claim that ADWR's finding that the letter was nonbinding is "highly controversial" and that Reclamation did not consider this intensity factor, warranting an EIS. (Doc. 63 at 22.) Plaintiffs also identifies public comments that emphasize that the Colorado River is the lifeblood of the river communities. (*Id.* 20-25 (citing AR Doc. 31).) Plaintiffs, however, do not provide any substantial dispute as to the "size, nature, or effect" of the Water Transfer, meaning it does not fall under the regulatory definition of "highly controversial." *See WildEarth Gardens*, 923 F.3d at 673. Thus, Plaintiffs have not raised a substantial question as to whether the Water Transfer is highly controversial so that it may have a significant effect on the environment.

### iv.   Highly Uncertain or Involve Unique or Unknown Risks

Plaintiffs argue that inconclusive data exists regarding the mitigation and avoidance of the worsening drought conditions on the Colorado River. (Doc. 63 at 25.) Plaintiffs cite to the general statement from a document in the administrative record that provides the Colorado River system is "experiencing long-term drought, exacerbated by climate change. Conditions continued to worsen in 2021." (Doc. 63 at 24 (citing AR Doc. 71 at 6055).) Reclamation argues that there are no uncertainties of the Water Transfer. (Doc. 65 at 30.) Reclamation also argues that it considered the mitigation and avoidance strategies in the EA. (*Id.* at 31.)

Under 40 C.F.R. § 1508.27(b)(5), Reclamation should consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id.* Section 1508.27(b)(5) does not "anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." *Am. Wild Horse Campaign v Bernhardt*, 963 F.3d 1001, 1008 (9th Cir. 2020) (quoting *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009)). "An agency must prepare an EIS where uncertainty regarding the environmental effects of a proposed action may be resolved through further data collection." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgt.*, 36 F.4th 850, 880 (9th Cir. 2022), *cert. denied sub nom. Am. Petroleum Inst. v. Envt'l Def. Ctr.*, — U.S. —, 143 S. Ct. 2582 (2023).

Here, Plaintiffs do not identify any alleged "effect on the human environment" from the Water Transfer that they believe is "highly uncertain" or an "unknown risk" but only that the data around the effects of the ongoing drought affect the environment of the Colorado River are unknown. (*See* Doc. 63 at 24-25.) Reclamation did consider the effects of the ongoing drought. (*See* AR Doc. 106 at 6684, 6686-87.) As such, Plaintiffs have not raised a substantial question as to the unknown risks of the Water Transfer that may have a significant effect on the environment.

### v.    Megadrought

Plaintiffs argue that Reclamation conducted an "inadequate analysis of the cumulative impacts of the Water Transfer in the context of climate change, the ongoing megadrought, and the resulting effects of the Colorado River." (Doc. 63 at 26.) Reclamation argues that Plaintiffs objections are "virtually verbatim to those made in their [Application for Preliminary Injunction]" and the Court previously rejected these arguments in the PI Order. (Doc. 65 at 32.) Reclamation further argues that climate change and drought are not "projects" or "actions" undertaken by an "agency (federal or nonfederal) or person." (Doc. 65 at 33.)

Reclamation must conduct a cumulative impact analysis to determine "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (cleaned up). A cumulative impact analysis, therefore, "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id.* at 994.

The Court finds that Reclamation did conduct an adequate analysis of the cumulative impacts related to the megadrought. "When environmental plaintiffs challenge

an EIS's cumulative . . . effects analysis, they usually contend that the EIS failed to consider the environmental effects of the project at issue in conjunction with the environmental effects of other past, present, and reasonably foreseeable future projects." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 763-64 (9th Cir. 1996) (cleaned up). Plaintiffs assert a blanket requirement that Reclamation needed to consider the context of climate change and the ongoing megadrought. (Doc. 63 at 26.) "NEPA does not require the government to do the impractical." *Id.* at 764. Plaintiffs are asking Reclamation to conduct an analysis of complex and amorphous issues outside the scope of 40 C.F.R. § 1508.7.

Even still, Reclamation did include a brief analysis of climate change and the ongoing drought in the EA. More specifically, Reclamation included within the "Cumulative Effects" analysis:

> Global climate change has been identified as a contributor to drought conditions in the Colorado River watershed and resulting water shortages on the river and the increase in greenhouse gases in the atmosphere globally has been identified as the principal driver of global climate change. The extended drought conditions in the Colorado River watershed and the associated reductions in water stored in the Colorado River System in turn could affect the availability of water for diversion and use in any of the alternatives considered in this EA. Ongoing drought contingency planning and negotiated stakeholder responses to extended drought conditions in the Colorado River watershed may partially mitigate these impacts.

(AR Doc. 106 at 6687.)

Furthermore, Reclamation included a cumulative impact analysis of current drought mitigation and water conservation actions. (*Id.* at 6684, 6686.) Plaintiffs' claim that Reclamation did not consider that "[t]hese contingency planning and stakeholder responses failed to maintain the levels of Lake Mead and Powell and required the Commissioner to call for an additional 2 to 4 million acre-feet of water to be left in Lakes Powell and Mead that would not be available for diversion." (Doc. 63 at 27.) In addition, Plaintiffs claim that

Reclamation mentions the water levels but not the amount that would not be available for diversion or the reductions and how these affect the river. (*Id.* at 28.) The EA, however, includes this information within the discussion of the "2007 Colorado River Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead, 2019 Lower Basin Drought Contingency Plan (LBDCP; Arizona Water Banking Authority 2019), Lower Colorado River Basin 500+ Plan (ADWR 2021) and other drought response activities." (AR Doc. 106 at 6684.) Specifically, the EA includes that "Reclamation is currently working with the seven states of the Colorado River Basin to conserve between 2 and 4 million acre-feet of water in the next year" and that "[t]he extended drought conditions in the Colorado River watershed and the associated reductions of water stored in the Colorado River System in turn could affect the availability of water for diversion and use in any of the alternatives considered in this EA." (*Id.*)

Ultimately, Reclamation considered that "[w]ith climate change impacting drought conditions, water could become increasingly scarce, especially when designated for wildlife benefit versus human development." (*Id.* at 6688.) It determined that this could occur "under any of the alternatives considered in the EA." (*Id.* at 6687.) Reclamation concluded that the Water Transfer would only result in "minor reduction in flow" and that the "cumulative impact of the Proposed Water Transfer . . . on biological resources would be minimal." (*Id.* at 6688, 6723.)

Thus, even if Reclamation was required to consider the cumulative impacts of climate change and the ongoing megadrought, Reclamation analyzed these factors in the EA to the extent that they were applicable to the Water Transfer. The Court therefore finds that Reclamation took the necessary hard look required under NEPA.

### vi. Lower Colorado River Multi-Species Conservation Program

Plaintiffs argue that Reclamation unreasonably relied on outdated data from the 2004 LCR MSCP to reach its conclusion of "no significant impacts" and failed to "obtain the comments of the U.S. Fish and Wildlife Services." (Doc. 63 at 28-29.) Plaintiffs argue

that Reclamation recently reinitiated consultation under Section 7 of the Endangered Species Act to reassess the 1.57 AFY reduction of river flow covered for by the LCR MSCP, but that Reclamation failed to include this analysis in the EA. (*Id.* at 29.)

Reclamation concedes that it reinitiated consultation under Section 7 and did not include this analysis in the EA, but contends that it was only for the purpose of assessing the reduction of flows in Reaches 2 and 3—and not Reaches 4 and 5, where the Water Transfer is impacted:

> Reclamation initiated Section 7 [Endangered Species Act] consultation with the Fish and Wildlife service to seek additional reduction in flow coverage for *reaches 2 and 3 only*. Reach 2 and 3 are from Hoover Dam to Parker Dam. The proposed action would result in a minor reduction in flow in reach 4, below Parker Dam, where Reclamation already has 1.57 million acre-feet in reduction in flow coverage under the [Endangered Species Act].

(Doc. 65 at 34-35; AR Doc. 106 at 6724 (emphasis added).)

Because Reclamation's consultation under Section 7 does not impact the amount of coverage provided for by the LCR MSCP in relation to the Water Transfer, the Court finds that this was not a factor requiring analysis here. As such, the Court finds that Reclamation reasonably relied upon the 2004 LCR MSCP in concluding that the Water Transfer would "not result in a reduction in the volume of flows below the Parker Dam beyond what was contemplated and is covered by the LCR MSCP." (*Id.* at 6689.)

### 3.     Conclusion

Plaintiffs have raised at least two substantial questions that the Water Transfer may have a significant effect on the environment. First, Plaintiffs show that the Water Transfer may establish a precedent for future water transfers with significant effects. *See* 40 C.F.R. § 1508.27(b)(6). Second, Plaintiffs show that the Water Transfer may have a cumulatively significant impact on the growth of Queen Creek that may cause significant effects. *See id.* § 1508.27(b)(7). Reclamation's determination that it did not need to conduct an EIS was arbitrary and capricious. *See Ocean Advocates*, 402 F.3d at 870 ("Preparation of an EIS is

mandated . . . where the collection of such data may prevent speculation on potential effects. The purpose of an EIS is to obviate the need for speculation." (cleaned up)). The Court therefore grants summary judgment in favor of Plaintiffs. (Doc. 63.)

**IV.     CONCLUSION**

Accordingly, for the forgoing reasons,

**IT IS ORDERED** denying Plaintiffs' Motion to Supplement the Administrative Record (Doc. 62).

**IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Summary Judgment (Doc. 63).

**IT IS FURTHER ORDERED** denying Reclamation's Motion for Summary Judgment (Doc. 65).

**IT IS FURTHER ORDERED** setting aside the Finding of No Significant Impact and remanding to the Bureau of Reclamation for preparation of an environmental impact statement under NEPA consistent with this decision.

**IT IS FURTHER ORDERED** setting a status conference for **Tuesday, March 19, 2024, at 2:00 PM** to determine how to proceed because the Water Transfer is underway. Parties must file simultaneous supplemental briefs. Separate order with more information to issue.

**IT IS FINALLY ORDERED** staying this Order and action pending the conclusion of the status conference.

Dated this 21st day of February, 2024.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge