TODD KIM, Assistant Attorney General
Environment & Natural Resources Division
ROMNEY S. PHILPOTT, Senior Attorney
Colo. Bar No. 35112
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace – Suite 370
Denver, CO 80202
(303) 844-1810
romney.philpott@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mohave County, *et al.*,<br><br>　　　　Plaintiffs<br><br>　v.<br><br>United States Bureau of Reclamation, *et al.*<br><br>　　　　Defendants. | Case No. 3:22-cv-08246-MTL<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF** |

The U.S. Bureau of Reclamation ("Reclamation"); M. Camille Calimlim Touton, Commissioner of Reclamation; and Jacklynn L. Gould, Regional Director, Interior Region 8, Lower Colorado Basin, Reclamation (collectively "Defendants"), provide this supplemental brief as required by the Court's February 21 and February 26, 2024 Orders (ECF Nos. 78, 79, and 81).

**INTRODUCTION**

In its February 21, 2024 Order, the Court ruled that Defendants violated the National Environmental Policy Act ("NEPA") because Reclamation incorrectly issued a Finding of No Significant Impact ("FONSI") for a partial assignment and transfer ("Transfer") of an Arizona fourth priority Colorado River water entitlement held by GSC Farm, LLC ("GSC Farm") to the Town of Queen Creek ("Queen Creek"). Feb. 21, 2024 Order ("MSJ Order"), ECF No. 78. The Court ordered the parties to provide supplemental remedy briefs "addressing how to proceed given that the . . . Transfer is underway." Feb. 26, 2024 Order, ECF No. 81. Defendants make two arguments in response to this question.

First, a key factor underlying how matters should proceed is the nature of the remand to Reclamation. In its MSJ Order, the Court stated it was "setting aside the [FONSI] and remanding to the Bureau of Reclamation for preparation of an environmental impact statement [("EIS")] under NEPA consistent with this decision." MSJ Order 30. However, the parties have not yet briefed the proper remedy for the Court's merits ruling, and therefore the Court issued its order without the benefit of the parties' positions. Under the circumstances in this case, Defendants believe that it is appropriate under Ninth Circuit caselaw for the Court to allow Reclamation to consider whether an EIS, or in the alternative, a supplemental environmental assessment ("EA") addressing the two specific defects found by the Court, is necessary to ensure compliance with NEPA. There are substantial differences between the two NEPA documents. NEPA and its implementing regulations govern the content and process for an EIS—and any EIS on remand would require a multi-year process entailing review of a variety of resources and issues—the vast majority of which were not raised in this litigation or for which the Court did not find

Reclamation's analysis wanting. On the other hand, a supplemental EA addressing the specific defects found by the Court could be completed in substantially less time and with less of a burden on the private parties to the Transfer and Reclamation. Under these circumstances, it is appropriate for the Court to allow Reclamation, in the first instance, to determine whether to prepare an EIS or supplemental EA on remand.

Second, Defendants maintain that Reclamation's FONSI and approval of the Transfer and execution of the contract documents for the Transfer should not be vacated during the remand. Defendants believe that the defects found by the Court are readily correctible and further do not indicate that Reclamation's overall determination—that the Transfer *itself* would not have significant impacts on the environment—was arbitrary or capricious. Further, vacatur of the Transfer and related contract documents would be very disruptive—particularly to third parties Queen Creek and GSC Farm. In contrast, Plaintiffs will suffer no harm if water deliveries to Queen Creek are continued during the remand. As such, Reclamation's decision to approve the Transfer and execution of the related documents should remain in place pending additional NEPA analysis.[1]

## **BACKGROUND**

### **I.      The Transfer**

Reclamation can only deliver an Arizona fourth priority Colorado River entitlement, such as that at issue here, if there is a "valid" contract between the user and the United States. *Arizona v. California*, 547 U.S. 150, 156 (2006). Prior to approval of the Transfer in this case, GSC Farm was party to such a contract, entitling it to divert up to 2,913.3 acre

---

[1] Defendants believe that these arguments are properly within the context of the briefing required by the Court, particularly as the parties have not previously briefed the appropriate remedy given the Court's merits ruling. However, to the extent the Court construes Defendants' arguments as requests for partial reconsideration, Defendants believe that the requests are authorized under Rule 54(b) of the Federal Rules of Civil Procedure. Further, to the extent Plaintiffs argue that Defendants should have made their arguments in a motion for reconsideration within 14 days of the MSJ Order consistent with LRCiv. 7.2(g), Defendants maintain that good cause for the timing of this request exists given Defendants' belief that such issues were to be addressed in the supplemental briefing ordered by the Court contemporaneously with its MSJ Order (the deadlines for which were extended at Plaintiffs' request).

feet per year ("AFY") for irrigation of its lands. ECF No. 63-1 at 6644, 6651-52.[2] GSC Farm and Queen Creek proposed a partial transfer of GSC Farm's entitlement to Queen Creek, and after the Arizona Department of Water Resources evaluated and recommended the assignment and transfer be approved, Reclamation initiated a review under NEPA to evaluate the potential environmental impacts from the Transfer. The formal EA process commenced in August 2021 with Reclamation's seeking public input during scoping, followed by preparation of a draft EA, accepting public comments on the draft EA, and then issuance of its final EA. *Id.* at 6647-50.

In its EA, Reclamation described the affected environment—and the potential consequences to the affected environment—from the proposed transfer and from two alternatives. *Id.* at 6657-90. The EA provided concise explanations as to why no significant impacts were expected with respect to air quality, Global Climate Change, groundwater, public health and safety, land use, visual resources, cultural and human resources, Indian trust assets, recreation, surface water quantity and quality, hydroelectric power, and vegetation/invasive species. *Id.* at 6649-50, 6659-63. It then focused on four key issues that Reclamation determined, informed by public comment during scoping, warranted detailed analysis: biological resources; socioeconomic concerns; prime farmlands; and environmental justice. *Id.* at 6649. It provided detailed analysis of these four issues, and explained why the Transfer would have no significant impacts with respect to them. Finally, the EA discussed the potential cumulative effects of the Proposed Action: it identified 18 separate past, present or reasonably foreseeable actions or issues to be addressed in the cumulative impacts analysis, and explained why the Transfer would not result in any cumulatively significant impacts. *Id.* at 6680-87.

Following issuance of the EA, Reclamation prepared a FONSI, which summarized the EA's findings, and determined that "the Proposed Action will not have a significant effect on the human environment" and, therefore, an EIS was not required. ECF No. 65-1,

---

[2] Consistent with the summary judgment briefing, administrative record page numbers are used for documents from the administrative record.

Ex. J, at 6736-38. Reclamation issued its FONSI in August 2022, approximately one year after commencing the NEPA process. *Id.*

**II. Case Proceedings**

On January 3, 2023, Plaintiffs filed their complaint challenging Reclamation's EA and FONSI, and shortly thereafter filed an application for preliminary injunction. ECF Nos. 1 & 9. The Court, after holding a hearing on March 8, 2023, denied the application. April 6, 2023 Order 30, ECF No. 49 ("PI Order"). The Court held that Plaintiffs had not demonstrated a likelihood of success on the merits, nor that an injunction was necessary to prevent irreparable harm. In particular, the Court noted that:

> Plaintiffs have not explained how the diversion of 2,033 AFY along an eighty-eight mile stretch of the Colorado River will worsen the current drought when this water is already being taken out of the River for agricultural use, especially when considering that this eighty-eight mile stretch will only experience additional monthly average reductions in flows of approximately 0.045 to 0.053 percent.

*Id.* at 27 (citing ECF No. 1-3 at 33). The Court further found that "there is no support in the record for Plaintiffs' assertion that the Proposed Water Transfer would significantly impact the economy of the Colorado River Communities." *Id.* Finally, it found that the "[t]he same 2,033 AFY [that was the subject of the transfer] will be consumptively used each year regardless of whether an injunction issues. It does not injure Plaintiffs if, during the pendency of the dispute, the water is stored and used by Queen Creek instead of being consumed to farm alfalfa or cotton by GSC Farm." *Id.* (quoting ECF No. 27 at 26).

After the Court denied the application for a preliminary injunction, on April 28, 2023, Reclamation (and GSC Farm and Queen Creek, respectively) executed the contracts to implement the Transfer, namely:

1. A partial assignment and transfer of GSC Farm's Entitlement to Queen Creek;
2. A Colorado River water delivery contract between the United States and Queen Creek providing for the delivery of up to 2,033.01 AFY at the Mark Wilmer Pumping Plan on behalf of Queen Creek;
3. An amendment of the existing Colorado River water delivery contract between GSC Farm and the United States to reduce GSC Farm's Entitlement to 69.93 AFY (50 AFY for consumptive use), and
4. a Reclamation Wheeling Contract with Queen Creek to wheel the Entitlement

4

to Queen Creek through the Central Arizona Project ("CAP") system. Copies of these documents (hereinafter referred to as the "Transfer Contracts") are attached hereto as Exhibits A-C.[3] Subsequently, in calendar year 2023, Queen Creek ordered and took delivery of 2,033 AF of water. Declaration of Jacklynn L. Gould ("Gould Decl."), attached hereto as Ex. D, ¶ 18 & Ex. 1 thereto. For calendar year 2024, Queen Creek has ordered full delivery of the 2,033 AF, and on December 28, 2023, Reclamation approved the order. Gould Decl. ¶ 19 & Ex. 2 thereto.[4]

In the meantime, this case progressed to briefing of the parties' cross-motions for summary judgment. On February 21, the Court ruled on the motions in its MSJ Order. In that order, the Court rejected many of Plaintiffs' arguments that Reclamation's analysis was inadequate. First, with respect to the "intensity" factors under former 40 C.F.R. § 1508.27(b), the Court held that Reclamation had adequately addressed whether the Transfer was highly controversial, because Plaintiffs did not identify "any substantial dispute as to the 'size, nature, or effect' of the Water Transfer[.]" MSJ Order 25 (quoting *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019)). Next, the Court held that Plaintiffs had not identified any alleged effect on the human environment that was "highly uncertain" or which presented an "unknown risk" under 40 C.F.R. § 1508.27 (b)(5) because they only argued that "the data around the effects of the ongoing drought affect[ing] the environment of the Colorado River are unknown." *Id.* at 28. Further, the Court expressly found that Reclamation "did consider the effects of the ongoing drought." *Id*. Moving to the general adequacy of the EA, the Court found that "if Reclamation was required to consider the cumulative impacts of climate change and the ongoing megadrought, Reclamation analyzed these factors in the EA to the extent that they were applicable to the Water Transfer." *Id.* at 26. Further, the Court found that Reclamation "reasonably relied upon the 2004 [Lower Colorado River Multispecies Conservation Plan

---

[3] The Wheeling Contract is included as an attachment to the water delivery contract.

[4] Under Queen Creek's delivery contract, Queen Creek must provide Reclamation with its water order for the upcoming calendar year by October 1. Ex. B ¶ 7.1. Reclamation has already received and approved Queen Creek's order for 2024. Gould Decl. Ex. 2.

("LCR MSCP")] in concluding that the Water Transfer would 'not result in a reduction in the volume of flows below the Parker Dam beyond what was contemplated and is covered by the LCR MSCP." *Id.* at 29 (quoting ECF No. 63-1 at 6688).

However, the Court also held that Reclamation's analysis of two of the 40 C.F.R. § 1508.27(b) intensity factors was inadequate. Specifically, the Court held that Reclamation did not adequately address "the degree of which the action may establish a precedent" under 40 C.F.R. § 1508.27(b)(6), because it did not provide "some explanation as to the scope or size of the potential precedential effect" of the Transfer. MSJ Order 19. Further, the Court found that Reclamation did not adequately analyze the extent to which the Transfer "is related to other actions with individually insignificant but cumulatively significant impacts" under 40 C.F.R. § 1508.27(b)(7). Specifically, in light of information in the record that Reclamation had not specifically analyzed in the EA, the Court held that it was "reasonably foreseeable that Queen Creek may try to acquire additional surface water to fulfill its needs." MSJ Order 23. The Court held that Reclamation should have "factored this information into its analysis rather than concluding the growth and impact are too speculative." *Id.* As a result, the Court set aside Reclamation's FONSI and remanded to Reclamation for preparing of an EIS. *Id.* at 30. However, the Court further stayed the Order and action pending supplemental briefing and a status conference addressing "how to proceed because the Water Transfer is underway." *Id.*

## ARGUMENT

**I. The Court Should Allow Reclamation to Prepare a Supplemental EA on Remand**

The Court did not find that Reclamation erred in determining that the Transfer *itself* would *not* have significant impacts to the environment. Instead, the Court determined that Reclamation inadequately addressed potential impacts arising from different, future actions. As a result, there is a reasonable possibility that Reclamation could cure the defects found by the Court by conducting an analysis on these issues in a supplemental EA. The Court therefore should remand to Reclamation to prepare either an EIS *or* a supplemental EA for further evaluation of the Transfer consistent with the Court's opinion.

6

The Ninth Circuit has made it clear that "preparation of an EIS is not mandated in all cases simply because an agency has prepared a deficient EA or otherwise failed to comply with NEPA." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008). For instance, if "there is uncertainty over whether the proposed project may have a significant impact, including uncertainty caused by an incomplete administrative record or an inadequate EA, the court should ordinarily remand for the agency to either prepare a supplemental EA or reconsider whether an EIS is required." *Id* at 1226 (citing *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000)). *See also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 239 (5th Cir. 2007) (holding that if the court finds "that the EA is inadequate in a manner that precludes making the determination whether the project may have a significant impact, the court should remand the case to the agency to correct the deficiencies in its analysis") (internal citation and quotation omitted) (cited in *Ctr. for Biological Diversity*, 538 F.3d at 1226). Indeed, this is true even where there are "significant flaws in the EA [that] undermine [an agency's] conclusion that the proposed action would have no significant effect on the environment. *Neighbors of the Mogollon Rim, Inc. v. U.S. Forest Serv.*, No. 22-15259, 2023 WL 3267846, at *3 (9th Cir. May 5, 2023) (holding that because the "seriously inadequate EA [at issue] creates significant uncertainty, we cannot 'categorically decide' that the agency could not support its conclusions in a revised EA"). By contrast, "if the court determines that the agency's proffered reasons for its FONSI are arbitrary and capricious and the evidence in a complete administrative record demonstrates that the project or regulation may have a significant impact, then it is appropriate to remand with instructions to prepare an EIS." *Ctr. for Biological Diversity*, 538 F.3d at 1225.

As discussed above, the Court made no finding that Reclamation arbitrarily or capriciously determined that the Transfer *itself* may result in significant impacts to the environment. Rather, the defects found by the Court were the failure to undertake analyses related to other, future actions or decisions. First, the Court found that Reclamation did not analyze the degree to which the Transfer may establish precedent for future transfers—

specifically that Reclamation did not provide "some explanation as to the scope or size of the potential precedential effect" of the Transfer. MSJ Order 19. Similarly, with respect to cumulative impacts, the Court found that Reclamation should have projected that Queen Creek, in the future, "may try to acquire additional surface water to fulfill its needs," and should have "factored this information into its analysis rather than concluding the growth and impact are too speculative." *Id.* at 23.

Neither of these analytic gaps found by the Court bring into question Reclamation's analysis that the Transfer itself would not have any significant impact on the environment. In fact, during the merits briefing, Plaintiffs did not even argue—and the Court did not find—that Reclamation's analysis of the potential impacts of the Transfer itself was inaccurate. Furthermore, the Court agreed with Defendants that Plaintiffs did not identify "any substantial dispute as to the 'size, nature, or effect' of the Water Transfer." *Id.* at 25 (quoting *WildEarth Guardians*, 923 F.3d at 673). *See also id.* at 26 (rejecting Plaintiffs' argument that the Transfer had highly uncertain or unknown risks related to the drought, and finding that Reclamation "did consider the effects of the ongoing drought").

Because the Court made no findings questioning Reclamation's determination that the Transfer itself would not result in significant impacts, it is appropriate to allow Reclamation the option of reconsidering whether an EIS is necessary after undertaking the missing analyses. *See Ctr. for Biological Diversity*, 538 F.3d at 1226 (finding it "questionable" that the agency could "on remand, prepare an EA that takes proper account of this evidence and still conclude that the [action] has no significant environmental impact" but nonetheless giving the agency the benefit of the doubt and declining "to order the immediate preparation of an EIS"). *See also Neighbors of the Mogollon Rim*, 2023 WL 3267846, at *3 (despite finding "significant flaws" in the EA, holding that "[a] full EIS may be necessary, but we leave that decision for the agency to consider in the first instance on remand"); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013) (remanding to the district court "to enter an appropriate order requiring BLM to remedy the deficiencies in the EA . . . or to prepare a more detailed EIS, whichever is considered

appropriate"); *All. for the Wild Rockies v. Gassmann Am. Forest Res. Council*, No. CV 21-105, 2023 WL 4172930, at *32 (D. Mont. June 26, 2023) (concluding that "Plaintiff has raised substantial questions about whether the Project will have a significant environmental effect under 40 C.F.R. § 1508.27(b)(7), (9), and (10)," but nonetheless remanding "without the instruction to prepare an EIS and instead allow[ing] the agencies to follow their ordinary processes to determine whether an EIS is required").

Practical considerations in this case corroborate the reasonableness of allowing Reclamation to determine whether the defects found by the Court might be addressed in a supplemental EA, or whether an EIS is required. The required content of an EIS is governed by NEPA and the Council for Environmentally Quality ("CEQ") implementing regulations. Therefore, an EIS on remand would not be limited to the specific issues identified by the Court—but rather will necessarily address a broad scope of resources and issues that were never challenged by the Plaintiffs (or found inadequately addressed by the Court). For instance, under the current version of the CEQ regulations, an EIS must address in its environmental consequences section:

> (1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.
> (2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.
> (3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.
> (4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.
> (5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)
> (6) Energy requirements and conservation potential of various alternatives and mitigation measures.
> (7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.
> (8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.
> (9) Means to mitigate adverse environmental impacts (if not fully covered

> under § 1502.14(e)).
> (10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

40 C.F.R. § 1502.16. *See also Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1012–13 (D. Alaska 2020) (noting that unlike an EA, which is meant only to determine *whether* a proposed action will have a significant impact on the environment, "an EIS must compare the environmental impacts of different alternatives, not just determine whether environmental impacts will occur").

Furthermore, while Reclamation may ultimately determine that an EIS is necessary, the EIS process will be time and resource-intensive. As discussed above, the formal process for the EA (from scoping to FONSI) took approximately one year. Preparing a full EIS will take substantially longer—because the process for preparing an EIS (like its content) is partially defined by regulation. Here, it will involve the following steps. First, before formally commencing the EIS process, Reclamation will enter into a funding agreement with one or both private proponents of the Transfer. Gould Decl. ¶ 6. Then, either Reclamation or those proponents will need to hire a consulting firm to prepare the EIS, and Reclamation will form a multidisciplinary team to plan and oversee the EIS process. *Id.* ¶¶ 8-9. Reclamation will next publish in the Federal Register a notice of its intent to prepare an EIS, and then undertake a new scoping process (including seeking public comments for at least 30 days). *Id.* ¶ 11; *see also* 40 C.F.R. § 1501.9. After Reclamation considers the information obtained through scoping, a draft EIS will need to be prepared. Next, the draft EIS will need to be published with a minimum 45-day comment period; and then a final EIS will need to be prepared (after Reclamation considers the public comments it received). 40 C.F.R. § 1502.9(a)-(c). Reclamation estimates that the process will take a minimum of two years for the formal EIS process (excluding preparation work, like preparing the funding agreement and hiring a contractor, which itself could take over a year)—and the costs associated with the EIS process will be orders of magnitude larger (and much longer) than that for an EA. Gould Decl. ¶¶ 12-16.

Ultimately, Reclamation may determine that it should prepare an EIS in light of the

Court's MSJ Order. But particularly because Plaintiffs have made no showing that the Transfer itself will have significant impacts to the environment—a supplemental EA could address the specific defects found by the Court and ensure compliance with NEPA.[5] The Court should therefore remand the Transfer decision to Reclamation for further analysis, consistent with the Court's MSJ Order, in either an EIS *or* a supplemental EA.[6]

## II. Vacatur of the FONSI and Transfer Contracts is Not Appropriate

The Court should not vacate the FONSI and the Transfer Contracts on remand.[7] The Transfer was ultimately approved and implemented by Reclamation's execution of the four Transfer Contracts, which are necessary for delivery of Arizona fourth priority Colorado River entitlement. An order from the Court vacating the FONSI and Transfer Contracts would leave Reclamation with *no* valid contracts under which it could lawfully deliver the water to Queen Creek or GSC Farm under *Arizona v. California*. Particularly balanced against the relatively minor nature of the EA's defects, the Court should avoid this disruptive result and not vacate the FONSI or the Transfer Contracts.

When an agency violates NEPA, "the presumptive remedy is vacatur of the deficient action." *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 997 (9th Cir. 2023) (citing *All. for Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018)).[8] Nonetheless,

---

[5] Plaintiffs' own prayer for relief in its Complaint is consistent with this result: it suggests that an order requiring Reclamation to prepare an adequate EA *or* an EIS could be appropriate. ECF No. 1 at 39 (praying that the Court "[o]rder Defendants to comply with NEPA by preparing an EIS or an adequate EA for the Transfer").

[6] Whether Reclamation prepares an EIS or a supplemental EA, Reclamation will continue to bear the burden of ensuring that it is complying with NEPA. And, again in either case, Plaintiffs (and other parties) will retain the option of seeking to challenge Reclamation's EIS/Record of Decision or supplemental EA/FONSI in Court.

[7] The United States recognizes that the MSJ Order has already stated that it is "setting aside" the FONSI. Accordingly, in this brief, the United States asks that the Court issue a new order following the April 14 Status Conference stating that the FONSI is not set aside pending remand.

[8] The United States' position is that "set aside" in APA Section 706 does not mean "vacate." *See* Br. of Pet'rs, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58), 2022 WL 4278395 at *40-44; Reply Br. for Pet'rs, 599 U.S. 670, 2022 WL 17170668 at *16-20. Defendants acknowledge, however, that Circuit precedent controls at this stage.

courts should not vacate the action when equitable principles counsel otherwise. *Id.*; *Ctr. For Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) ("We leave invalid agency action in place 'when equity demands' that we do so") (quoting *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). When determining whether an agency's action should remain in effect on remand, the Ninth Circuit has instructed courts to apply a two-factor balancing test, weighing "the seriousness of the agency's errors against "the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

A. The Errors in the EA do not Warrant Vacatur

Without minimizing the nature of the errors found by the Court, they are not so serious as to warrant vacatur of the FONSI and Transfer Contracts. As discussed above, the Court generally did *not* find the analyses in the EA wanting—and it made no finding questioning Reclamation's overall determination that the Transfer would *not* significantly impact any of the numerous resources (ranging from threatened species to resources impacted by drought to socioeconomic concerns) evaluated in the EA. Instead, the Court found that Reclamation (1) did not analyze the potential precedential impact of the Transfer with respect to potential *future* transfer requests; and (2) did not adequately analyze the potential for Queen Creek (again, in the *future*) to seek additional surface water to support its planned growth. MSJ Order 16-19.

The nature of these errors counsel against vacatur for two reasons. First, the Court determined that Reclamation's analysis was wanting—not because the analyses Reclamation *did* perform were arbitrary or capricious (particularly with respect to the impacts from the Transfer itself)—but because of analyses that Reclamation *did not* perform (or did not pursue far enough). Such defects are readily curable on remand thereby weighing against vacatur. *See W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 995 (D. Idaho 2021) (deciding not to vacate lease decision when "the failings of the assembly of the [agency's] EAs relate, for the most part, to the absence and/or

incompleteness of analyses").

Second, Reclamation reasonably could reach the same result after remand. *See Pollinator Stewardship Council*, 806 F.3d at 532 (noting that an important consideration is "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand"); *Allied–Signal*, 988 F.2d at 151 (declining to vacate because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand"); *WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41, 83-85 (D.D.C. 2019) ("[N]othing in the record indicates that on remand the agency will necessarily fail to justify its decisions to issue EAs and FONSIs," and therefore remanding "the EAs and FONSIs to BLM so that the agency may address the deficiencies identified by the Court above.") Again—and critically—nothing in the record supports a finding that the Transfer itself is going to cause significant impacts to the environment. Rather, the Court found that Reclamation should have evaluated its import for potential future decisions or actions. As such, there is a "serious possibility" that Reclamation, after undertaking additional NEPA, could conclude that the environmental impacts from the Transfer are not so substantial that the Transfer should be rejected—and that an EIS is not necessary. *See Allied–Signal*, 988 F.2d at 151; *Pollinator Stewardship Council*, 806 F.3d at 532. Under these circumstances, the nature of the NEPA defects weigh against vacatur.

### B. Vacatur of the FONSI and Transfer Documents would be Disruptive

Moving to the second factor, vacatur of the FONSI and Transfer Contracts would be disruptive. As the Court has recognized, the Transfer Contracts, supported by the FONSI, have been executed, and water has been delivered to Queen Creek. In calendar year 2023, 2,033 AF of water was delivered to Queen Creek. Gould Decl. ¶ 18. Queen Creek has ordered delivery of 2,033 AF in calendar year 2024. *Id.* ¶ 19.

If the Transfer Contracts are vacated, Reclamation cannot deliver water to Queen Creek (or to GSC Farms). As noted above, Reclamation can only deliver an Arizona fourth

priority Colorado River entitlement, such as that at issue here, if there is a contract between the user and the United States. *Arizona,* 547 U.S. at 156; *see also* 43 U.S.C. § 617d ("No person shall have or be entitled to have the use for any purpose of the water stored as aforesaid except by contract made as herein stated."). Furthermore, because delivery must be pursuant to a "valid" contract, *Arizona* 547 U.S. at 156, vacatur of the FONSI could give rise to questions as to whether the Transfer Contracts are valid and legally authorize the delivery of water under *Arizona v. California*.

The primary disruptive effect of vacating the FONSI and Transfer Contracts will be felt by water users, GSC Farm and Queen Creek.[9] Queen Creek will be unable to use the water, potentially for years, for its planned purposes, and there undoubtedly are significant financial and operational implications for Queen Creek and GSC Farms under their private contract. *See* MSJ Order 19 (noting $20 million purchase price paid by Queen Creek); *see also Cal. Communities Against Toxics*, 688 F.3d at 994 (noting that consequences of

---

[9] Plaintiffs sued the government under the Administrative Procedure Act ("APA") but did not sue GSC Farms and Queens Creek. Relief against non-federal parties exceeds the APA, which authorizes relief only against the government. 5 U.S.C. §§ 702, 706(2). Further, because Queen Creek and GSC Farms were never made parties to the case, there may be some question as to the appropriateness of vacating or rescinding the Transfer Contracts. *See, e.g.*, *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring) (federal courts provide "party specific relief" and "[i]f the court's remedial order affects nonparties, it does so only incidentally"); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 110 (1969) ("a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant"). This question can arise when contract rights are at issue. *See NRDC v. Kempthorne*, 539 F.Supp.2d 1155, 1185 (E.D. Cal. 2008) (noting that "[i]t is well-settled that in an action to set aside a contract, all parties to the contract must be present") (internal citation omitted). *See also Kettle Range Conservation Grp. v. U.S. BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998) (finding in NEPA case that the "district court correctly determined that it was without authority to rescind the contract [for a land exchange] in the absence of joinder of the private parties"); *Pac. Coast Fed'n of Fishermen's Assocs. v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1062 (E.D. Cal. 2013) (finding Plaintiffs' agreement to "limit significantly" the available remedies by their insistence that they "do not seek to invalidate the interim [water delivery] contracts" allowed application of the public rights exception to the joinder rules); *Colo. Env't Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1259 (D. Colo. 2012) (declining to cancel oil and gas leases already issued by BLM partially in light of questions whether "the parties that would be affected by such a decision are properly before the Court").

vacatur "would also be economically disastrous"). Defendants expect that these parties will more fully describe the disruptive consequences of vacatur from their perspective.[10]

In contrast, Plaintiffs would not suffer any harm if the Court does not vacate the FONSI and Transfer Contracts and water deliveries continue during the remand. The Transfer was implemented in calendar year 2023 and 2,033 AF of water was delivered to Queen Creek—and Defendants are aware of no injury that Plaintiffs suffered as a result. Indeed, as discussed above, the Court expressly found during the Preliminary Injunction proceedings that Plaintiffs had failed to demonstrate any risk of actual harm to themselves if the Transfer were allowed to occur during the pendency of this litigation. *See supra* at 4; PI Order 26-28. There similarly is no reason to expect that Plaintiffs would now suffer harm if the water deliveries to Queen Creek are allowed to continue during remand.[11] Nor is vacating the FONSI necessary to protect Plaintiffs: their fundamental interest is in ensuring that Reclamation complies with NEPA with respect to the Transfer. The Court's remand directs Reclamation to do exactly that. Allowing the FONSI to remain in effect until Reclamation issues either (1) a new FONSI based on a supplemental EA, or (2) an EIS addressing the Transfer, will have no impact whatsoever on Plaintiffs' interests.

In sum, given the relatively minor and readily correctable nature of Reclamation's errors found by the Court, balanced against the disruptive consequences that would result, the Court should exercise its discretion and not vacate the FONSI and Transfer Contracts.

## CONCLUSION

Defendants respectfully request that the Court (1) remand the Transfer to Reclamation to cure the defects found by the Court in an EIS or a supplemental EA; and (2) order that neither the FONSI or the Transfer Contracts are vacated pending the remand.

---

[10] For Reclamation's part, the disruptive effect on its operations would less substantial. If Queen Creek and GSC cannot take delivery of scheduled water, Reclamation could deliver such water to other Arizona water users with a valid contract pursuant to the Arizona Priority System. *See* Gould Decl. ¶ 21.

[11] Similarly, a permanent injunction would not be appropriate for this reason. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010).

Respectfully submitted this 22nd day of March, 2023.

> TODD KIM
> Assistant Attorney General
>
> _/s/ Romney S. Philpott_
> ROMNEY S. PHILPOTT, Senior Attorney
> U.S. Department of Justice
> Environment & Natural Resources Division
> Natural Resources Section